KIRO, Inc., Successor to Queen City Broadcasting Co., Petitioner *v.* Commissioner of Internal Revenue, Respondent

Docket No. 92134. Filed October 28, 1968.

*Charles Horowitz* and *Gordon G. Conger*, for the petitioner.
*Eugene H. Flood*, for the respondent.

Bruce, *Judge:* Respondent determined deficiencies in income tax for the calendar years 1955, 1956, 1957, and 1958 in the amounts of $11,876.78, $72,864.19, $31,888.20, and none, respectively.

Several issues have either been settled or withdrawn, and certain additional deductions conceded in the stipulations of facts, effect to all of which will be given in the computations to be made under Rule 50.

Two issues remain to be decided as follows:

(1) Whether the respondent erred in disallowing $245,506.71 of the $424,158.87 deducted for "Film rentals and purchases" claimed as a part of the cost of operations on line 5, page 2, and Schedule B, page 5, of petitioner's 1958 U.S. Corporation Income Tax Return.

(2) Whether petitioner claimed excessive net operating loss deductions in 1955, 1956, and 1957 based upon the carryback of a net operating loss suffered in 1958 as a result of the deduction claimed for "Film rentals and purchases." A ruling on issue 1 will automatically dispose of this issue.

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulation of facts and the supplemental stipulation of facts, together with the 90 exhibits attached thereto are incorporated herein by this reference.[1]

---

[1] Petitioner's request for a "statement of the facts" includes many quotations from the two stipulations. Since we are incorporating by reference the stipulations and all of the exhibits in our findings of fact, we will omit some of these requested quotations from our findings and quote the omitted portions we deem material to a decision either in the body of our opinion or as a footnote at the appropriate place.

KIRO, Inc., a Utah corporation, sometimes hereinafter referred to as petitioner, is successor to Queen City Broadcasting Co., sometimes referred to herein as Queen City, which last-mentioned corporation was a corporation organized under the laws of the State of Washington with its principal office in Seattle, Wash., on the date the original petition in this proceeding was filed. The calendar year returns of Queen City for the taxable years 1955 through 1958 were filed on the accrual basis with the district director of internal revenue, Tacoma, Wash.

Petitioner became a successor to Queen City by virtue of a joint agreement and plan of merger on or about February 3, 1964, between Wasatch Radio & Television Co., a Utah corporation (name changed to KIRO, Inc.), and Queen City, which joint agreement and plan of merger was fully performed and became effective March 31, 1964.

The notice of deficiency was mailed to Queen City, which corporation filed the original petition. On July 28, 1964, this Court granted a motion to file an amended and supplemental petition and ordered the caption amended so as to read as herein stated.

Petitioner's predecessor, Queen City, had operated a radiobroadcasting station prior to 1958. The Federal Communications Commission (FCC) issued a "Construction PPermit" to Queen City in July 1957, and a "Program Test Authority" in February 1958, for the broadcasting of television on channel 7 in Seattle, Wash. Queen City began television broadcasting in February 1958.

A television station such as KIRO which is affiliated with one of the three national networks (CBS) will have approximately 60 percent of its broadcast time taken up with network-originated programs. Of the remaining time, for which the station must provide its own programming, about two-thirds is filled by filmed or taped shows, with live programs accounting for approximately one-third. Thus, feature films and syndicated television films series constitute a major part of KIRO programming.

In 1958 and in the years following, the following conditions existed: Substantially all of the revenue of a television station is provided by charges for broadcast time paid by advertisers for the advertising of products and services. Advertisers are national, regional, or local, and pay for spot announcements or sponsored programs. Petitioner, having a CBS network affiliation, derives a substantial portion of its advertising revenue from the nationally sponsored programs, the revenues being passed through from the network to the local affiliate from advertisers who in buying such time are interested in the opportunity to present their advertising messages to the largest audience possible for the cost incurred. The rates charged by the station are, in

general, determined by the size and composition of the viewing audience viewing the station, and vary according to the audience for the different times of the day. The three most significant factors in estimating the size and composition of the viewing audience are (1) the number of television stations in the area and the total potential viewing audience; (2) the day of the week and the time segment of the day; and (3) the relative "attractiveness" of the program.

Since petitioner's revenues depend upon the size of the audience it is able to reach, it made (and makes) every effort to get the largest possible viewing audience. The primary factor in securing a high-level audience is programming; that is, securing programs that will attract more viewers than the programs of the competing stations. In this competitive effort, there are two basic sources of programs: Network programs and local programs, the latter category including not only programs actually produced locally, but also film programs produced in Hollywood and elsewhere and delivered to the station on film. Throughout the history of television network, film programs have been an important source of programming.

In general, the highest revenues are charged during the times of the greatest availability of audience. In order to command top rates, the station will attempt to gain a large share of the available audience by showing the most attractive program possible, having in mind program costs as well as other limitations.

Petitioner charged advertisers a sum of money for the use of its facilities to advertise the services or products of television program sponsors.

In determining rates to be charged for advertising, petitioner considered, among other things, time classifications when most viewers are available, and the size of the audience.

In 1958 there were three network affiliated stations in the Seattle market; namely, station KOMO (channel 4), station KING (channel 5), and station KIRO (channel 7). In addition, there was a nonaffiliated station KTNT, formerly the CBS network affiliate, with headquarters in Tacoma, Wash., and a nonaffiliated station KTVW (channel 13) with headquarters in Tacoma, Wash., and the education station KCTS (channel 9). Aside from channel 9, the television stations in the Seattle market were very competitive commercially but all of the aforesaid stations competed for audience in the Seattle market.

When KIRO–TV began to broadcast on or about February 8, 1958, it was important to build up the listening audience in order to build up advertising revenue. KIRO was the lowest rated of the three network stations in Seattle and in 1958, during some months, was

even lower than the former CBS outlet station KTNT with head-quarters in Tacoma, Wash. In 1958 Eugene E. Wecker was film director of KIRO–TV and as such had charge of the use of film on television.

In the case of feature film programs, the attraction depends on (1) the quality of the film (Does it include current name personalities? Is it a good performance? Is it a good technical production?); (2) previous exposure (Is it a first run or a repeat?); and (3) the time period of a day (When it is shown).

The principal objective in film programming is to establish, maintain, or increase the television audience as measured by audience-rating service reports sent to stations and other interested persons in the television broadcasting industry.

The makeup or mix of the programming of a television station necessitates exercise of the best possible judgment of the station management based on experience, knowledge, etc. A poor choice of program may depress the rate at which advertising can be sold by the station, thus affecting directly the net income. Should such a rate decline occur, the station loses in two ways: First, there is the loss of revenue; second, where the program is a continuing one, certain irreducible overhead costs tend to remain. In cases where the decision must be made to abandon the program, the unrecovered costs remain to be reckoned with after the revenues have ceased.

Selection of programs and particularly programming for future use is subject to a number of variable factors, such as time of day, size of audience, composition of audience, competing programs from other stations, and the programs which precede and follow the program being considered. Programs from competing stations in the adjacent time areas are important factors. In addition, there are problems of displacement that occur when a sponsor or the network (in the case of affiliated stations) desires to preempt the air time after a station has scheduled or acquired a program or film package.

To the extent then that the station management relies on feature film programs, the selection of the film to be run at any given time must take into account all of the many factors, having always in mind the objective of attaining the optimum in net profit from the station operation.

The value of a film in this case has been judged in part by the program director's opinion of its effect on bureau ratings. Advertisers sometimes do and sometimes do not match their advertising with the motion picture televised. The film director exercises his judgment as to the film to be selected for showing. In doing so he relies in part upon information made available to him concerning nature and

quality of the film involved. Such data is derived from a catalog-sized book, entitled "Feature Film Source Book," vol. 4, issue 6, fall 1962, published by Broadcast Information Bureau, New York, N.Y.

In evaluating films in terms of "quality" and for cost assignment, petitioner took into account many factors, including cast, running time, year produced, whether dramatic action, mystery, or science fiction; story line; newspaper syndicate ratings; estimated number of viewers expected to watch; audience-measuring reports referred to as rating services; star value, title of the movie; how well it had done in the theatrical release, opinion of others, number of runs it had had; weather, winter months as opposed to summer months; awards such as an Oscar; ethnic makeup of a population, makeup of an audience as adults, children, or teenagers, a matter of national interest; promotion of a film, previews of a film; and that the judgment or opinion of the program director of each particular television station is important. There is an exercise of judgment of individual program managers of different broadcasting stations in the allocation of film expenses, i.e., initial film cost.

American Research Bureau, Inc. (ARB), prepares Television Audience Reports for sale to subscribers, including petitioner. The data set forth in these reports was used by petitioner in the regular course of its business.

Several different methods of determining the amount of film costs to be expensed in a given accounting period are recommended by management personnel and used in the broadcasting industry.

Among those methods is one which follows the principles underlying the "income forecast" method. (Cf. Rev. Rul. 60–358, 1960–2 C.B. 68; and Rev. Rul. 64–273, 1964–2 C.B. 62). There is no exclusive or single "correct" method of depreciation or amortization of package-film contract costs. There are uncertainties involved in programming for television broadcasting. These uncertainties naturally affect the prediction of future developments and events. Thus, revenues might not necessarily be matched with costs on a particular film where, for example, it is sought to increase the size of the viewing audience in an effort to increase later sales; but, overall, increased revenue may or will result over a period of time by the use of first-run films as compared with the use of poorer quality films or films previously shown. The foregoing is a factor in the application of the accounting principles calling for association of cost and revenue. There is nothing about the problem of allocation of film-package costs that precludes the application of recognized and accepted sound accounting principles.

In 1958, petitioner as licensee entered into 41 contracts with licensors

for films to be telecast at a total film cost of $1,196,319.90. This cost is made up of the following:

| | | |
|---|---|---|
| 1 | Contract with Paramount for 700 films having limited exposures at a cost of | $845,250.00 |
| 35 | Contracts with licensors for 1,407 films having limited exposures at a cost of | 265,674.50 |
| 5 | Contracts with licensors for other films having unlimited exposures at a cost of | 85,395.40 |
| 41 | Totals | 1,196,319.90 |

On line 5, page 2, and Schedule B, page 5, of petitioner's 1958 U.S. Corporation Income Tax Return, petitioner claimed as a part of the cost of operations a deduction for "Film rentals and purchases" in the amount of $429,570.93. This amount is made up of *four divisions*, as follows:

| | |
|---|---|
| (1) Amortization or depreciation of 700 Paramount films (1 contract) having limited exposures | $234,875.81 |
| (2) Amortization or depreciation of 1,407 other films (35 contracts) having limited exposures | 136,984.20 |
| (3) Amortization or depreciation of certain other films (5 contracts) having unlimited exposures | 52,298.86 |
| Subtotal | 424,158.87 |
| (4) Print and miscellaneous expenses | 5,412.06 |
| Total | 429,570.93 |

The respondent did not disallow any part of division (4). He did disallow $245,506.71 of the other 3 divisions, as follows:

| Division | Petitioner claimed | Respondent allowed | Respondent disallowed |
|---|---|---|---|
| (1) | $234,875.81 | $56,190.00 | $178,685.81 |
| (2) | 136,984.20 | 101,910.66 | 35,073.54 |
| (3) | 52,298.86 | 20,551.50 | 31,747.36 |
| Totals | 424,158.87 | 178,652.16 | 245,506.71 |

In a statement attached to the deficiency notice the respondent explained his disallowance thus: "(a) It is held that the deduction claimed on your return for film rental and purchase expense was overstated to the extent of $245,506.71."

The difference between the amortization or depreciation claimed by petitioner and that allowed by the respondent lies in the "Method" used. Petitioner used a sliding-scale method whereas the respondent used a straight-line method.

This may be illustrated by a concrete example taken from the Paramount contract mentioned in division (1). This contract is headed "Paramount Feature Films For Television License Agreement" between licensor and licensee on September 16, 1958. Licensee was given the right to telecast 700 named films over a 10-year period. The number of telecasts or exposures was limited to 7 telecasts for each film, or a total of 4,900 telecasts. The total license fee for the 700 films, including a 5-percent payment to the American Federation of Musicians, was $845,250. The cost of each film varied from $105 per film to $7,875 per film and fell into 12 groups, as follows:

| Group | Cost per film | Number of films | Total cost |
|---|---|---|---|
| 1 | $7,875.00 | 23 | $181,125.00 |
| 2 | 5,617.50 | 36 | 202,230.00 |
| 3 | 4,646.25 | 21 | 97,571.25 |
| 4 | 3,990.00 | 13 | 51,870.00 |
| 5 | 2,493.75 | 25 | 62,343.75 |
| 6 | 1,260.00 | 39 | 49,140.00 |
| 7 | 840.00 | 46 | 38,640.00 |
| 8 | 735.00 | 47 | 34,545.00 |
| 9 | 525.00 | 93 | 48,825.00 |
| 10 | 315.00 | 144 | 45,360.00 |
| 11 | 210.00 | 107 | 22,470.00 |
| 12 | 105.00 | 106 | 11,130.00 |
| Totals | | 700 | 845,250.00 |

Paragraph 11 of the Paramount contract provided that the licensor had the right to withdraw any licensed film upon certain conditions therein stated. Paragraph 12 dealt with adjustments in price upon withdrawal. Subparagraph (ii) of paragraph 12 provided that upon withdrawal "Licensee shall be entitled to a credit or refund in an amount equal to the percentages of the original per film license fee * * * set forth in Schedule C attached hereto and made a part hereof." Schedule C provided that "The percentage referred to in Paragraph 12(ii) for the purpose of determining the credit or refund to Licensee with respect to *each* film is the percentage which appears in the box in the chart below * * *." The box here applicable is the following:

| Number of telecasts licensed | Number of times licensee has actually telecast said withdrawn film | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 7 | 40% | 25% | 20% | 15% | 10% | 5% | 0 |

In other words, if the license fee of a withdrawn film was $7,875, and the licensee had made one telecast of the film before it was withdrawn, the refund would be 40 percent of $7,875, or $3,150. If there

had been two telecasts, the refund would be 25 percent of $7,875, or $1,968.75, etc.

On the basis of Schedule C, petitioner claimed amortization or depreciation of its Paramount films in accordance with the following formula:

| 1st run | 2nd run | 3rd run | 4th run | 5th run | 6th run | 7th run |
|---------|---------|---------|---------|---------|---------|---------|
| 60% | 15% | 5% | 5% | 5% | 5% | 5% |

The theory of the formula was that if upon withdrawal of the film after one telecast, petitioner would get a refund of only 40 percent, it was manifest that 60 percent of the cost of the film had been used up in the first telecast and that only 40 percent of the cost of the film should remain as an asset in the balance sheet. The same theory would apply to all of the other runs.

The respondent determined amortization or depreciation of the Paramount films in accordance with the following formula:

| 1st run | 2nd run | 3rd run | 4th run | 5th run | 6th run | 7th run |
|---------|---------|---------|---------|---------|---------|---------|
| 14²/₇% | 14²/₇% | 14²/₇% | 14²/₇% | 14²/₇% | 14²/₇% | 14²/₇% |

Thus the amortization or depreciation of the Paramount films, division (1), claimed by petitioner and allowed by respondent for the last 3½ months of 1958 on the 12 groups of film is shown as follows:

| Group | Contract price | Amortized cost per telecast [1] | | Telecasts in 1958 | Amortization or depreciation | |
|-------|---------------|-----------|------------|-------|-----------|------------|
| | | Petitioner | Respondent | | Petitioner | Respondent |
| 1 | $7,875.00 | $4,725.00 | $1,125.00 | 10 | $47,250.00 | $11,250.00 |
| 2 | 5,617.50 | 3,370.50 | 802.50 | 20 | 67,410.00 | 16,050.00 |
| 3 | 4,646.25 | 2,787.75 | 663.75 | 10 | 27,877.50 | 6,637.50 |
| 4 | 3,990.00 | 2,394.00 | 570.00 | 10 | 23,940.00 | 5,700.00 |
| 5 | 2,493.75 | ([2]) | 356.25 | 18 | [3] 25,810.31 | 6,412.50 |
| 6 | 1,260.00 | 756.00 | 180.00 | 26 | 19,656.00 | 4,680.00 |
| 7 | 840.00 | 504.00 | 120.00 | 21 | 10,584.00 | 2,520.00 |
| 8 | 735.00 | 441.00 | 105.00 | 15 | 6,615.00 | 1,575.00 |
| 9 | 525.00 | 315.00 | 75.00 | 16 | 5,040.00 | 1,200.00 |
| 10 | 315.00 | 189.00 | 45.00 | 3 | 567.00 | 135.00 |
| 11 | 210.00 | 126.00 | 30.00 | 1 | 126.00 | 30.00 |
| 12 | 105.00 | 63.00 | 15.00 | 0 | 0 | 0 |
| Total | | | | | 234,875.81 | 56,190.00 |

[1] All first runs except group 5.
[2] Amortized cost per telecast for a first run is 60 percent of $2,493.75, or $1,496.25, and for a second run is 15 percent of $2,493.75, or $374.06.
[3] $25,810.31 computed as follows:

| 17 runs @ $1,496.25 per run | $25,436.25 |
|---|---|
| 1 run @ $374.06 per run | 374.06 |
| Total | 25,810.31 |

The amortization or depreciation of 1,407 other films (35 contracts), division (2), having limited exposures claimed by petitioner and allowed by respondent for 1958 is shown as follows:

| Joint exhibit | Contract price | Number of films | Maximum runs permitted | Amortized cost per telecast respondent | Telecasts in 1958 | Amortization or depreciation | |
|---|---|---|---|---|---|---|---|
| | | | | | | Petitioner | Respondent |
| 8-H | $15,840.00 | 15 | [1] 8 | $132.00 | 15 | $7,354.60 | $1,980.00 |
| 9-I | 3,200.00 | 16 | 4 | 50.00 | 25 | 1,860.00 | 1,250.00 |
| 10-J | 400.00 | 2 | 4 | 50.00 | 2 | 200.00 | 100.00 |
| 11-K | 300.00 | 2 | 2 and 4 | 50.00 | 3 | 204.55 | 150.00 |
| 12-L | 69,600.00 | 58 | 8 | 150.00 | 32 | 22,362.50 | 4,800.00 |
| 13-M | 4,240.00 | 23 | Various | 56.53 | 34 | 2,814.00 | 1,922.02 |
| 14-N | 3,392.00 | 16 | 4 | 53.00 | 33 | 2,575.80 | 1,749.00 |
| 15-O | 20,000.00 | 18 | Various | 156.25 | 10 | 5,405.00 | 1,562.50 |
| 16-P | 5,512.50 | 7 | 7 | 112.50 | 6 | 1,626.25 | 675.00 |
| 17-Q | 1,000.00 | 10 | 2 | 50.00 | 12 | 700.00 | 600.00 |
| 18-R | 4,000.00 | 8 | 6 | 83.33 | 0 | 0 | 0 |
| 19-S | 350.00 | 1 | 1 | 350.00 | 1 | 350.00 | 350.00 |
| 20-T | 1,300.00 | 13 | 2 | 50.00 | 23 | 1,180.00 | 1,150.00 |
| 21-U | 2,925.00 | 39 | 2 | 37.50 | 32 | 1,440.00 | 1,200.00 |
| 22-V | 6,860.00 | 98 | 2 | 35.00 | 27 | 1,134.00 | 945.00 |
| 23-W | 9,724.00 | 26 | 1 | 374.00 | 19 | 7,106.00 | 7,106.00 |
| 24-X | 15,496.00 | 221 | Various | 66.22 | 184 | 11,316.00 | 12,184.48 |
| 25-Y | 7,020.00 | 52 | 1 | 135.00 | 33 | 4,455.00 | 4,455.00 |
| 26-Z | 5,200.00 | 52 | 2 | 50.00 | 73 | 3,960.00 | 3,650.00 |
| 27-AA | 5,200.00 | 52 | 2 | 50.00 | 69 | 3,800.00 | 3,450.00 |
| 28-AB | 4,890.00 | 76 | 2 and 3 | 30.00 | 153 | 4,056.00 | 4,590.00 |
| 29-AC | 8,200.00 | 82 | 2 | 50.00 | 58 | 3,480.00 | 2,900.00 |
| 30-AD | 3,900.00 | 39 | 2 | 50.00 | 39 | 2,340.00 | 1,950.00 |
| 31-AE | 3,900.00 | 39 | 2 | 50.00 | 39 | 2,340.00 | 1,950.00 |
| 32-AF | 3,900.00 | 39 | 2 | 50.00 | 72 | 3,660.00 | 3,660.00 |
| 33-AG | 8,820.00 | 126 | 2 | 35.00 | 222 | 7,980.00 | 7,770.00 |
| 34-AH | 3,900.00 | 39 | 2 | 50.00 | 49 | 2,740.00 | 2,450.00 |
| 35-AI | 4,000.00 | 80 | 2 | 25.00 | 110 | 3,120.00 | 2,750.00 |
| 36-AJ | 11,700.00 | 39 | 1 | 300.00 | 27 | 8,100.00 | 8,100.00 |
| 37-AK | 5,200.00 | 52 | 2 | 50.00 | 73 | 3,960.00 | 3,650.00 |
| 38-AL | 9,945.00 | 26 | 1 | 382.50 | 13 | 4,972.50 | 4,972.50 |
| 39-AM | 1,950.00 | 13 | 1 | 150.00 | 13 | 1,950.00 | 1,950.00 |
| 40-AN | 3,250.00 | 13 | 1 | 250.00 | 13 | 3,250.00 | 3,250.00 |
| 41-AO | 9,100.00 | 7 | Various | Various | 6 | 4,140.50 | 1,971.66 |
| 42-AP | 1,460.00 | 8 | Various | Various | 14 | 1,051.50 | 777.50 |
| Totals | 265,674.50 | 1,407 | | | | 136,984.20 | 101,910.66 |

[1] The parties agree and have stipulated that respondent erred in finding that the contract provided for 8 runs whereas it only provided for 6 runs, and that on the basis of 6 runs the amortization or depreciation allowed, if respondent's method is approved, should have been $2,640 instead of $1,980, a difference of $660.

The amortization or depreciation of films having *unlimited* exposures (5 contracts) division (3), claimed by petitioner and allowed by respondent for 1958 is shown as follows: (Note: Amortization or depreciation cost per telecast and number of telecasts in 1958 not shown by the record.)

| Joint exhibit | Kind of film | Contract price | License period | Months of license | Amortization or depreciation per month | Months in 1958 | Amortization or depreciation | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Petitioner | Respondent |
| 44-AR | 25 Warners | $34,125.00 | 3/ 1/58-2/28/62 | 48 | $710.94 | 10 | $21,435.50 | $7,109.40 |
| 45-AS | Terrytoons | 11,880.00 | 7/ 1/58-1/15/61 | 30 | 396.00 | 5½ | 2,292.00 | 2,178.00 |
| 46-AT | 221 Cartoons | 17,500.00 | 3/ 1/58-2/28/62 | 48 | 364.58 | 10 | 11,540.00 | 3,645.80 |
| 47-AU | 132 Cartoons | 16,790.40 | 3/15/58-3/14/61 | 36 | 466.40 | 9½ | 13,601.61 | 4,430.80 |
| 48-AV | 60 Laurel and Hardy. | 5,100.00 | 5/19/58-5/18/59 | 12 | 425.00 | 7½ | 3,429.75 | 3,187.50 |
| Totals | | 85,395.40 | | | | | 52,298.86 | 20,551.50 |

In the case of a film contract for a group of films for a lump-sum price, petitioner allocated such cost on the basis of petitioner's estimate of the fair value of the film involved to each film before applying the sliding-scale basis above mentioned.

Exhibit 12–L referred to in a previous schedule was a contract dated December 10, 1959, amending a prior contract dated December 10, 1957, between National Telefilm Associates, Inc., and petitioner for telecast over petitioner's facilities of 58 motion-picture films designated "The Champagne Package" with the right to run each film eight times over a 3-year period beginning March 1, 1958. Petitioner, however, elected to use a six-run basis for the purpose of writing off the cost for the reason that it was believed it would not be able to get more than two exposures per year. Much like the Paramount package, the cost of each film varied, as determined by Wecker, from $100 per film to $5,450 per film and fell into five groups, as follows:

| Group | Cost per film | Number of films | Total cost |
|---|---|---|---|
| 1 | $5,450 | 6 | $32,700 |
| 2 | 2,500 | 6 | 15,000 |
| 3 | 1,000 | 5 | 5,000 |
| 4 | 500 | 32 | 16,000 |
| 5 | 100 | 9 | 900 |
| Totals | | 58 | 69,600 |

A fair disclosure of the financial condition of a corporation is necessary to permit such corporation to exercise proper budgetary control, dividend declaration, and corporate planning generally. If the financial condition of a corporation is not fairly disclosed, both with respect to its inventory of films on hand and with respect to film usage, a distortion of income results, which interferes with and may thwart proper budgetary control, management decisions, dividend policy, and corporate planning generally.

In amortizing or depreciating film costs of feature and syndicated films and cartoons previously mentioned in divisions (2) and (3), petitioner allocated film expense on films licensed to be shown more than once in accordance with the following formula:

### FEATURE AND SYNDICATED FILMS

| | Percent | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1st run | 2d run | 3d run | 4th run | 5th run | 6th run | 7th run | 8th run |
| 2-run films | 60 | 40 | | | | | | |
| 3-run films | 55 | 30 | 15 | | | | | |
| 4-run films | 50 | 25 | 15 | 10 | | | | |
| 5-run films | 50 | 20 | 15 | 10 | 5 | | | |
| 6-run films | 50 | 20 | 15 | 10 | 3 | 2 | | |
| 7-run films | 50 | 20 | 15 | 10 | 3 | 1 | 1 | |
| 8-run films | 50 | 20 | 15 | 10 | 2 | 1 | 1 | 1 |

### CARTOONS

| | Percent | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 1st run | 2d run | 3d run | 4th run | 5th run | 6th run | 7th run | 8th run | 9th run | 10th run |
| 8-run films | 25 | 20 | 15 | 10 | 9 | 8 | 7 | 6 | | |
| 9-run films | 25 | 20 | 15 | 10 | 8 | 7 | 6 | 5 | 4 | |
| 10-run films | 25 | 20 | 15 | 10 | 8 | 7 | 6 | 5 | 3 | 1 |

In the case of a film contract for a group of films for a lump-sum price, petitioner allocated such cost on the basis of petitioner's estimate of the fair value of the film involved to each film before applying the sliding-scale basis above mentioned. In the case of a contract allowing an unlimited number of film showings over a stated period of time, petitioner first estimated the probable number of runs of each film involved and then applied a sliding-scale basis for the film expense involved.

Both in the Seattle market, in which petitioner broadcasts, and in the industry generally, an earlier run of a film, and particularly the first run, has greater audience appeal than subsequent runs, and in the broadcasting of films to television audiences films normally earn a smaller amount of revenue from each successive reshowing in the Seattle market.

OPINION

One issue remains for our decision, namely, whether the respondent erred in holding that the deduction claimed by petitioner on its 1958 return for "Film rentals and purchases" of $429,570.93 was overstated to the extent of $245,506.71. In our findings we stated that the $429,570.93 was composed of four divisions, to wit:

| | |
|---|---|
| (1) Amortization or depreciation of 700 Paramount films (1 contract) having limited exposures | $234,875.81 |
| (2) Amortization or depreciation of 1,407 other films (35 contracts) having limited exposures | 136,984.20 |
| (3) Amortization or depreciation of certain other films (5 contracts) having unlimited exposures | 52,298.86 |
| Subtotal | 424,158.87 |
| (4) Print and miscellaneous expenses | 5,412.06 |
| Total | 429,570.93 |

Respondent allowed all of division (4) and parts of the other three divisions, as follows:

| Division | Petitioner claimed | Respondent allowed | Respondent disallowed |
|---|---|---|---|
| (1) | $234,875.81 | $56,190.00 | $178,685.81 |
| (2) | 136,984.20 | 101,910.66 | 35,073.54 |
| (3) | 52,298.86 | 20,551.50 | 31,747.36 |
| Totals | 424,158.87 | 178,652.16 | 245,506.71 |

In his opening statement at the hearing, counsel for respondent said in part:

It is respondent's position that petitioner claimed an excessive rental expense deduction of $245,000 in 1958. The film rental deduction is an issue of some importance to the entire television industry. In the last ten years that business has literally grown like Topsy and like a new ship has had to undergo the riggers [sic] of a shakedown cruise. It has gone through a period of experimentation or

trial and error in both physical operation and bookkeeping or accounting procedures. Its accounting practice or the manner in which they computed the deduction claim [sic] for film rental expense is after several years of deferment now before this court for resolution.

It was stipulated that:

In the year 1958 petitioner claimed deduction for $424,158.87 paid or incurred to licensors of movie film shown on petitioner's television station. Respondent disallowed $245,506.71 of the deduction so claimed on the ground that the total costs of the television films are deductible by the television station in aliquot amounts over the period of the agreement, in accordance with the provisions of section 1.162–11(a) of the Regulations.

At the outset, petitioner contends that respondent's determination was arbitrary, excessive, and without rational foundation and should, therefore, be set aside under the rule of *Helvering* v. *Taylor*, 293 U.S. 507. Suffice it to say, we do not agree. The burden is upon petitioner to establish the amount of the deduction it claimed. *Burnet* v. *Houston*, 283 U.S. 223. For reasons later given, we think petitioner has met that burden as to divisions (1) and (2) but not as to division (3).

The question involved is a mixed question of law and fact. Notwithstanding the portion of the stipulation above quoted the parties tried this case more or less on the theory that the deductibility of any part of the total costs would be deductible under either section 162 or 167 of the 1954 Code, the material portions of which are in the margin.[2]

---

[2] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There *shall* be allowed as a depreciation deduction *a reasonable allowance for the exhaustion,* wear and tear (including a reasonable allowance for obsolescence)—

　　(1) *of property used in the trade or business,* or
　　(2) of property held for the production of income.

(b) USE OF CERTAIN METHODS AND RATES.—For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a) shall include (*but shall not be limited to*) an allowance computed in accordance with regulations prescribed by the Secretary or his *delegate,* under any of the following methods :

　　(1) the straight line method,
　　(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),
　　(3) the sum of the years-digits method, and
　　(4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2).

*Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a).*

(c) LIMITATIONS ON USE OF CERTAIN METHODS AND RATES.—Paragraphs (2), (3), and (4) of subsection (b) shall apply only in the case of property (*other than intangible property*) described in subsection (a) with a useful life of 3 years or more—

　　[Emphasis supplied.]

The parties agree that the 41 license agreements here involved are intangible assets. Intangible assets may be the subject of a *depreciation* allowance. See sec. 1.167(a)–3, Income Tax Regs.[3]

In his original brief, respondent made this statement:

There are many cases dealing with depreciation or amortization of intangibles. It is now well recognized that for income tax purposes deductions must be taken by a taxpayer for exhaustion of contracts and like property where there is a basis or cost and such property has a definite determinable life and is used in the trade or business or held for the production of income. * * *

In his reply brief, however, respondent takes the position that section 167 of the Code is not applicable. He categorically says "It is respondent's position that petitioner's contract rights to use the films are not subject to the allowance for depreciation under section 167 of the Code." This statement prompted a motion by petitioner for leave to file a supplemental brief, which motion we granted. In the supplemental brief petitioner begins with saying that it—

seeks permission to file this supplemental brief because of the surprising and unexpected contention advanced for the first time in Reply Brief for Respondent * * *

* * * * * * *

Respondent apparently became aware of the difficulties of defending its position on straight line amortization. As petitioner pointed out, straight line film write-off expense conforms neither to the *facts of life* of petitioner's business nor is such write-off in accordance with industry practice or generally accepted accounting principles. [Emphasis supplied.]

Respondent's contention that only section 162 of the Code is applicable is based primarily upon section 162(a)(3);[4] section 1.162–11(a), Income Tax Regs.;[5] and Rev. Rul. 62–20 (1962–1 C.B. 21).

Cases holding that depreciation is allowable on intangible assets that meet the requirements of section 1.167(a)–3, Income Tax Regs.,[6] are legion. *Birmingham News Co.* v. *Patterson*, 224 F. Supp. 670 (1963), affirmed per curiam 345 F. 2d 531 (C.A. 5, 1965); *Commissioner* v. *Seaboard Finance Co.*, 367 F. 2d 646 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court; *Inter-City Television Film*

---

[3] Income Tax Regs., sec. 1.167(a)–3 Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

[4] See fn. 2.

[5] Income Tax Regs.

Sec. 1.162–11  Rentals.

(a) Acquisition of a leasehold. If a leasehold is acquired for business purposes for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run. * * *

[6] See fn. 3.

*Corp.*, 43 T.C. 270; and *David Hoffman*, 48 T.C. 176. The *Hoffman* case is an excellent example of a case that might also have been decided under section 162(a)(3), *supra*, and the accompanying regulations,[7] which goes to show that section 162(a)(3) is not exclusive in that some other section of the Code might also be applicable.[8]

Section 1.162–11(a) of the regulations is captioned "Acquisition of a leasehold." The 41 contracts here in question do not deal with the acquisition of leaseholds, but are license agreements between licensors and petitioner giving petitioner the right to use certain films in its trade or business. The cost of such films to petitioner are exhaustible as such films are used and we think petitioner should under section 167(a)(1), *supra*, "be allowed as a depreciation deduction a reasonable allowance for the exhaustion * * * of property used in the trade or business." We hold that section 1.162–11(a) of the regulations is not applicable to the facts of this case. Since Rev. Rul. 62–20, *supra*, is based upon section 1.162–11(a), we likewise hold the ruling to be inapplicable.

Section 167(b), *supra*, provides that the term "reasonable allowance" as used in subsection (a) shall include "but shall not be limited to" an allowance computed under any of four methods. And, subsection (b) provides that *"Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a)."* (Emphasis supplied.) Under subsection (c) of section 167 three of the methods mentioned in subsection (b) are not available to petitioner here because the 41 contracts here involved are conceded to be "intangible property." That would leave only "the straight line method" mentioned in subsection (b), but that subsection specifically provides that the "reasonable allowance" as used in subsection (a) "shall not be limited to" an allowance computed under any of the methods mentioned in subsection (b). Therefore, the use of the straight-line method is not compulsory if it does not produce a "reasonable allowance for the exhaustion" of the contracts under subsection (a). For reasons hereinafter stated we do not think the so-called straight-line method produces the "reasonable allowance" provided for in section 167(a) of the Code under the circumstances of this case.

As shown in our findings, the parties have stipulated that several different methods of determining the amount of film costs to be ex-

---

[7] See fns. 2 and 5.

[8] It may be noted that not all intangible assets are subject to a depreciation allowance. There is the indivisible asset rule which holds that an indivisible intangible asset having an indeterminable useful life is not subject to a depreciation allowance. *Richard M. Boe*, 35 T.C. 720, affd. 307 F. 2d 339 (C.A. 9, 1962). Cf. *Commissioner* v. *Indiana Broadcasting Corporation*, 350 F. 2d 580 (C.A. 7, 1965), certiorari denied 382 U.S. 1027, reversing 41 T.C. 793; *Commercial Credit Industrial Corp.*, 47 T.C. 296; and Stapleton, "Intangible Assets and the Television Industry," 45 Taxes 685 (1967). The instant case does not fall under this rule. Cf. *Commissioner* v. *Seaboard Finance Co.*, 367 F. 2d 646 (C.A. 9, 1966).

pensed in a given accounting period are recommended by management personnel and are used in the broadcasting industry. In Rev. Rul. 60–358, 1960–2 C.B. 68, the respondent stated that it was the position of the Internal Revenue Service that the "income forecast" method constitutes "an acceptable method for computing a reasonable allowance for depreciation of the cost of television films under section 167(a) of the Code." Substantially this entire ruling was set out in footnote 6 of *Inter-City Television Film Corp., supra.* The taxpayer in *Inter-City* did not seek to use the "income forecast" method. It sought to use the "cost recovery" method.[9] In holding that the "cost recovery" method was not appropriate we said in part:

But it is apparent that petitioner's method is not an "income forecast" method of amortization and, in fact, petitioner has strenuously insisted throughout that such method would not be feasible here because it would be impossible to estimate or forecast reasonably the future income from its television exhibition rights. Therefore, petitioner feels it is entitled to use the cost-recovery method under which it would realize no taxable income from the film rights until their cost had been fully recovered. In other words, petitioner's bold logic seems to be that where a taxpayer finds himself unable to qualify for this liberal income-forecast method of amortization, he is entitled to an even more liberal method. * * *

We do not agree that the cost-recovery method is appropriate in this case.

We then went on to hold that for lack of a better method under the circumstances of the case the respondent's method of computing amortization on a straight-line method was proper.[10]

The parties have also stipulated that there is no exclusive or single "correct" method of depreciation or amortization of package film contract costs; and that there is nothing about the problem of allocation of film-package costs that precludes the application of recognized and accepted sound accounting principles.

Regarding the straight-line method it was stipulated that:

So-called "straight line" amortization of film package costs is one method followed by some but not by other television stations in the television industry. The straight-line method is not designed to give specific recognition to the varying quality of each separate film included in a purchased package of many films or to give effect to each station's own experience, which may show that some films in the package may be shown only once, others several times, some not at all. *Nor does the straight-line amortization method give effect to the fact that an earlier run of a film generally has greater audience appeal than subsequent runs.* [Emphasis supplied.]

[9] The "cost recovery" method was referred to in Rev. Rul. 60–358, as follows :
"Some producers of television films have used the so-called 'cost-recovery' method in reporting their income. By use of this method, no taxable income is reported until the income from the films exceeds the cost thereof. However, such 'cost recovery' method is not acceptable for Federal income tax purposes."
[10] The taxpayers in *Inter-City* and Rev. Rul. 60–358 were licensors rather than licensees. The only difference would be that in the case of licensors there is the problem of salvage value whereas that problem is not present in the case of licensees.

We deem it appropriate at this place (see fn. 1) to set out in the margin certain portions of the supplemental stipulation.[11]

As stated in our findings, the difference between the amortization or depreciation [12] claimed by petitioner and that allowed by the respondent lies in the "method" used. Petitioner used a sliding-scale method whereas the respondent used a straight-line method. These two methods are fully illustrated in our findings by a concrete example taken from the Paramount contract showing exactly how the deduction of $234,875.81 claimed by petitioner and the $56,190 allowed by the respondent were computed. This one contract alone comprises over 72 percent of the amount of the claimed deduction disallowed by the respondent.

We think the method used by the petitioner is the correct method to use in this case. It coincides with the evidence and with the "facts of life" of the television industry.[13]

The evidence is overwhelming that the first run of a film is the most important run and that each successive run diminishes rapidly in value. The first run is generally run in prime time and attracts the highest number of viewers. Each subsequent run receives less viewers and pro-

---

[11] These portions follow :

47. Television stations employ various practices in amortizing the cost feature film or program packages. If a package includes a series of films which may be shown only once for a specified price per episode, there is no problem in charging that price to expense as each episode is telecast.

a. On the other hand, complications arise if a lump-sum price covers a number of films and if those films may be rerun either a specified or unlimited number of times extending over a period of years.

b. Many television stations may deal with this problem in steps. First, the total package cost is allocated to individual films ; and, second, the cost so allocated to each film is apportioned to the number of showings permitted or planned. The amounts so apportioned are written off as the films are telecast.

48. All films in a film package may or may not be of equal cost. Sound accounting practice requires that the initial amount assigned to film license cost should be expensed in accordance with generally accepted accounting principles that assets should be stated at cost when they are acquired. This assignment of cost to the intangibles here has a bearing upon subsequent income accounting, including write off or amortization which is at issue here.

49. When a license agreement does not apportion the license fee to the respective films, sound accounting practice requires the licensee to make such apportionment.

[12] All through this case the parties have referred to the deduction claimed as being for "depreciation or amortization." It may be noted that neither sec. 162 nor 167 uses the word "amortization" as such. Sec. 162 is captioned "Trade or Business Expenses" ; and sec. 167 is captioned "Depreciation." However, we do not deem it necessary to belabor the point.

[13] The Court of Appeals for the Seventh Circuit, in *Commissioner* v. *Indiana Broadcasting Corporation,* 350 F. 2d 580 (1965), certiorari denied 382 U.S. 1027, reversed our decision in 41 T.C. 793, because the statistical analysis made in that case "ignores the facts of life of the television broadcasting industry." There the court held that our finding that the estimated useful life of 2-year renewable television network affiliation contracts was ascertainable and that the contracts were "depreciable assets" was clearly erroneous. However, the *Indiana Broadcasting* case did not involve television films.

duces less revenue.[14] The parties to the Paramount contract recognized this important fact in the refund clause of that contract. The contract provided that the licensor had the right to withdraw any licensed film upon certain conditions. The contract gave the licensee the right to run each of the 700 films seven times. It then provided that if the licensor withdrew the film after it had been run once the licensor would refund the licensee only 40 percent of the contract price on the theory that 60 percent of the cost of the film had been used up in the first telecast and that only 40 percent of the cost of the film remained as an asset to appear in the balance sheet. If the licensor withdrew the film after it had been run the second, third, fourth, fifth, sixth, or seventh time, the refund would gradually be reduced to 25 percent, 20 percent, 15 percent, 10 percent, 5 percent, and zero percent for each successive run, respectively. Based upon this refund clause petitioner claimed a deduction for exhaustion of each film telecast in accordance with the following formula:

| 1st run | 2d run | 3d run | 4th run | 5th run | 6th run | 7th run |
|---------|--------|--------|---------|---------|---------|---------|
| 60%     | 15%    | 5%     | 5%      | 5%      | 5%      | 5%      |

The respondent allowed a straight-line deduction of 14 2/7 percent for each of the seven runs.

The amounts so claimed and allowed are set out in schedule form in our findings.

Respondent's straight-line method does not give effect to the fact that exhaustion of the cost of the films is the greatest on the first run of the film and diminishes substantially on successive runs. If the license agreement provided for only one showing there would be no problem. The entire cost of the film (100 percent) would be deductible when the telecast occurred. The parties have stipulated that "If a package includes a series of films which may be shown only once for a specified price per episode, there is no problem in charging that price to expense as each episode is telecast." Therefore it seems only reasonable that if a contract provides for more than one showing the exhaustion should be allocated among the several showings on a graduated or sliding-scale basis so as to allocate the larger portions to the earlier showings. In determining what that allocation should be, we know of no better measurement to use than the one the parties to the agreement themselves agreed upon.

[14] Attached to the stipulation is a 17-page document prepared by Maurice LeCompte, an internal revenue agent, in cooperation with petitioner's employees. This report analyzed at random 12 of the 700 films of the Paramount contract to ascertain the gross revenue produced from the first, second, third, and fourth telecasts of such films in 1958, 1959, 1960, and 1961, respectively. From this sampling the LeCompte report showed that the revenue from the second, third, and fourth showings were only 52.8 percent, 44.2 percent, and 29.5 percent, respectively, of the revenue from the first showing, a gradual decline for the later showings.

The respondent's main objection to the method used by petitioner is that the result gives an unreasonable allowance. He argues that the 700 films cost petitioner $845,250; that under petitioner's method, petitioner is claiming a deduction for the last 3½ months of 1958 of $234,875.81, or over 27 percent of the entire cost; and that this on its face would indicate an unreasonable amount. We think the respondent in so arguing overlooks the fact that in 1958 petitioner was just beginning to telecast in a very competitive field; that it was of the utmost importance that petitioner capture the largest possible audience in the shortest period of time; that the cost per film of the 700 films varied from $105 per film to $7,875 per film; and that in order to capture the largest possible audience petitioner decided to run the most expensive films first. We think that when consideration is given to such facts as just stated, the deduction claimed by petitioner under division (1), while large, was nevertheless reasonable and is allowable under section 167(a)(1), *supra.* We so hold.

Our holding with respect to division (2) is the same as in division (1). The principle used in ascertaining the deduction with respect to the cost of the 35 contracts is the same as was used in the Paramount contract. These contracts however, did not contain a refund clause like the one contained in Paramount. When petitioner started televising in 1958 it secured the services of two men experienced in the television industry, Becker, who was made film director and Leonard Nachbar, a certified public accountant who came with petitioner in May 1958 to take care of its accounting. Both men had had experience with Station WTCN in Minneapolis. Nachbar had been with Ernst & Ernst for 5 years before he became a certified public accountant and had audited two television stations. Based on their prior experience and the refund clause of the Paramount contract Becker and Nachbar worked up the formula set out in our findings (which was stipulated) that was used in computing the claimed deductions in divisions (2) and (3). In support of this formula and the one used in division (1) petitioner also introduced the testimony of Warde B. Ogden, a certified public accountant and a partner of Price Waterhouse & Co. Ogden is in charge of a group within the firm that specializes in the entertainment industry, including television. The firm audits from 30 to 40 television broadcasting companies annually. In January 1961, Ogden wrote a book entitled "The Television Business Accounting Problems of a Growth Industry" a copy of which was filed as petitioner's Exhibit 92. About 10,000 copies of the book have been circulated. At pages 131 and 132 Ogden discusses in general terms the question here involved. Under the heading "Current Amortization Methods" Ogden writes:

Stations employ a number of techniques in amortizing the costs of syndicated program packages. If a package includes a series of films which may be shown

only once for a specified price per episode, there is no problem in charging that price to expense as each episode is telecast.

On the other hand, complications arise if a lump sum price covers a number of films and if those films may be rerun either a specified or unlimited number of times extending over a period of years. Most feature film packages fall into this category.

At present, stations are using a very broad range of techniques to amortize the cost of long-range syndication contracts. Without attempting to catalogue all the methods in current use it should be of interest to outline several general approaches to the problem.

Many stations approach this problem in two steps. First, the total package cost is allocated to individual films, and second, the cost so allocated to each film is apportioned to the number of showings permitted or planned. The amounts so apportioned are written off as the films are telecast.

The first step of allocating the total package price to individual films is generally done in a way that reflects the relative quality of the films. The more desirable pictures are assigned higher values than the lower quality films. This, of course, requires an appraisal of the films included in the package and in many cases the syndicator is able to assist the station in making its evaluation.

In assigning individual film costs to the several showings it is customary to use a schedule of declining percentages which results in charging each reshowing with a smaller cost than the preceding showing. * * *

Then follows a table which shows that for a two-run film the exhaustion of the cost charged off would be 65 percent for the first telecast and 35 percent for the second telecast; for a three-run film the exhaustion would be 50 percent, 35 percent, and 15 percent, respectively, etc.

Ogden testified that sound accounting required petitioner to use "some kind of an accelerated or sliding scale method of amortization to write off film expense" and that he agreed with the method used by petitioner in computing the deductions claimed under divisions (1) and (2). He criticized the straight-line method used by respondent, in part, as follows:

Well, it is a method of amortization or depreciation which writes off the cost in a straight line, in other words, equal installments either over a period of time or period of use. It doesn't give any recognition to the unequal value of the periods or usage. * * *

Well, in the television film business, in most cases, and the case we are dealing with here, the asset isn't used up in a straight line. It is used up at an accelerated rate which means that a straight line method causes a distortion, a distortion of that income because in the early periods of a license term you would not write off enough cost, therefore you would be overstating your income. This would be offset by an understatement of income at the end of that license term. This just isn't good accounting.

Ogden was of the opinion that Rev. Rul. 62-20, *supra*, relied upon by the respondent, was not consistent with good accounting for the reason that it did not recognize the unequal value of films in a package or of runs of a given film.

Regarding division (3) we do not think petitioner has met its burden. Division (3) consisted of five contracts having unlimited exposures. As shown in our findings, the deduction allowed by the respondent was allowed on a monthly basis. For instance, the contract for the 25 Warners ran for 48 months from March 1, 1958, to February 28, 1962, and cost petitioner $34,125, or at the rate per month of $710.94. For the 10 months in 1958, respondent allowed 10 times $710.94, or $7,109.40. Petitioner had claimed a deduction for the 25 Warners of $21,435.50. Although these runs were *unlimited* Wecker testified that he estimated there would only be seven runs. He considered each of the 25 films to be of equal value. The evidence does not show how many telecasts there were in the Warner group in 1958 or whether the telecasts were first, second, third, fourth, fifth, sixth, or seventh runs. The evidence as to how petitioner arrived at the deduction claimed for the other four contracts in division (3) is likewise vague and insufficient. They were Terrytoons, cartons, and 60 films of Laurel and Hardy. Ogden testified as to the five contracts in division (3) in part as follows:

Q. In your opinion, is it sound accounting practice to refuse to permit the taxpayer to estimate the probable number of runs and then apply the amortization table in such a case?

A. I think this is a little different than the others, you have got two methods here, either one of which may be all right.

Q. Which is preferable, in your opinion? * * *

A. I think here the agent's method might be an acceptable method. I think what the company did is preferable.

Q. Why?

A. Well, assuming the company can make a sound reason or judgment as to the number of runs they are going to use, it is much better to write off the cost as those runs are used.

We hold that the evidence offered as to the five contracts in division (3) is insufficient to show error on the part of respondent. We sustain the respondent's determination as to division (3).

While we have omitted from our findings and opinion some of petitioner's requested quotations from the stipulations, such as definition of terms and the precise manner in which the books were kept (see fn. 1), such stipulations were incorporated in our findings by reference and have been carefully considered in arriving at our "resolution" of the issue.

In conclusion we sustain the respondent's disallowance of $31,747.36 (division 3) of the $424,158.87 deduction claimed for "Film rentals and purchases" but hold that the respondent erred in disallowing $213,759.35 (divisions 1 and 2) of the claimed deduction. This automatically disposes of issue 2.

*Decision will be entered under Rule 50.*