OPINION The sole issue for decision is whether petitioner, an accrual method taxpayer, overstated its deductions for television film rentals in the taxable years 1957,1958, and 1959. This opinion must be presented against the backdrop of KIRO, Inc., 51 T.C. 155 (1968), in which the Court considered the same issue. The dispute in that case focused on three categories of films: (1) 700 Paramount films (1 contract) having limited exposures. (2) 1,407 other films (35 contracts) having limited exposures. (3) Other films (5 contracts) having unlimited exposures. The taxpayer had allocated the cost of each contract to the individual films in the package. The taxpayer then reallocated the cost of each film to its individual showings. The reallocation was done on a sliding scale which provided higher rates to earlier showings. We rejected the straight-line method advocated by the Commissioner and approved the taxpayer’s sliding-scale method as to the first two categories of films. Petitioner has adopted the approach of KIRO, Inc., supra, and has asserted a further method of calculating its deduction in lieu of the straight-line method adopted by respondent in making his determination herein. We have concluded that under the facts presented petitioner has not established that its method was a proper one. Both parties have dealt with the issue involved herein in the context of section 167(a) (1) .[2] Under the foregoing circumstances, it is not necessary for us to decide whether that section or section 162(a) (3)[3] applies. See KIRO, Inc., supra at 167-168; Allen M. Early, 52 T.C. 560, 570 (1969) (dissenting opinion).[4] Whether the claimed method involves depreciation or amortization, petitioner must fail. Petitioner states that the basic theory underlying its method is to match film costs with predicted film usage. The matching is purportedly accomplished at the contract negotiation stage. Petitioner contends that it negotiates'the schedule of payments under each contract to coincide with the projected useful life to it of the film-program materials' included within that contract. Consistent with its theory, petitioner deducted each year the same amounts as its payments during said year. We do not think in actual practice petitioner’s schedules of payments coincided with exhaustion of the value of its films. The periods of payment were generally shorter than the permitted periods of usage. The Court recognizes that television films increasingly lose their audience appeal with, each successive run. We cannot agree with petitioner, however, that the films usually had been run so many times by the end of the payment period that they held minimal value to the station at that time. Petitioner fails to consider that the films were of significant value as “fill” during the years in issue. Petitioner’s station was one of the few in the country that had lost outright its network affiliation. What KTNT-TV needed was material just to sustain its programing from noon to midnight. To achieve-that goal, the station promptly purchased large numbers of films. Accordingly, the Court feels that because of the unique unfortunate circumstances of KTNT-TV during the years in issue, reruns of a particular film continued to have value to the station throughout the full term of the license period. In another respect we find fault with petitioner’s method. Under several of the license agreements monthly installments increased in amount as the license periods progressed. For example, in Exhibit 21-U the initial installments were $150 per month. Monthly installments in succeeding years increased to $200, $450, and then $500. The same pattern occurred in Exhibit 39-AM. The first three monthly payments were each $2,000. Subsequent monthly payments rose steadily to $2,400, then $3,000, and finally to $4,000. Petitioner alleges that under its method the payments coincided with usage. If that is so, and acknowledging the fact that television films diminish in value upon each successive showing, the foregoing payments should have decreased rather than increased. The film contracts placed in issue reveal two further defects in petitioner’s method of allegedly having payments correspond to usage. First, the payments under some contracts sharply fluctuated. It would demand considerable imagination to say that such fluctuation in payments reflected fluctuation in usage. For instance, the payments due under Exhibit 9-1 as of July 1959 were: $2,000.00 on each, of July 15, 1959, August 15, 1959; $2,770.00 on September 15, 1959; $300.00 on each of October 15,1959, November 15,1959, December 15,1959; $60.00 on each of January 1, 1960, February 1, 1960, March 1, 1960; $1,000.00 on each of April 1, 1960, May 1, 1960, June 1, 1960; $75.00 on each of July 1, 1960 and August 1, 1960; $500.00 .on each of September 1, 1960 and October 1, 1960 until total unpaid balance of $12,000.00 is paid in full. A second defect of petitioner’s method was that payments under some contracts began in the taxable year preceding commencement of the license period. Since petitioner is an accrual method taxpayer, this would be quite improper. For instance, petitioner was entitled under Exhibit 41-AO to telecast a syndicated series “Night Court U.S.A.” Although the petitioner did not begin showing the series until 1959 payments commenced in 1958. Likewise, under Exhibit 16-P, a feature-film contract, the license period did not commence until 1959 but payments were made in 1958. We consider petitioner’s method principally a device of cost accounting. For instance, it does not appear that the extensions for payment referred to above were based upon revised estimations of increased usage. Statements in petitioner’s correspondence suggested that petitioner requested these payment extensions simply to accumulate more funds to acquire additional films. Petitioner adopted a group or composite procedure instead of allocating the total cost of a particular contractual package to its individual feature films.[5] We do not think such method was correct. A composite writeoff rate must necessarily raise the question whether it reaches a reasonable result. In deciding that question we have considered that the quality mix of films encompassed within a feature-film contract is quite diverse. The ratings of films vary from A (excellent) to E (least desirable). The A films will be shown at least once during prime viewing hours. Gradually they will be shifted to less popular hours. On the other hand, E films might never be shown at all. In negotiating its contracts, petitioner’s station had no choice as to the mix of films offered by the distributor under a given contract. Under the facts presented we do not regard the composite or group procedure appropriate for writing off petitioner’s licensed feature films. The films within the licensed packages were too diverse as to quality. Petitioner strongly contends that its composite method is an accurate averaging technique which facilitates decisions by senior personnel of the station. As stated above, we do not think petitioner’s averaging method is sufficiently accurate as a method of writeoff for Federal income tax purposes. Although the method appears conducive to efficient management decisions, petitioner mistakenly assumes that it is appropriate for tax purposes. Petitioner cites Portland General Electric Co. v. United States, 189 F.Supp. 290 (D. Oreg. 1960), affirmed per curiam 310 F.2d 877 (C.A. 9, 1962). It is petitioner’s opinion that the case presents a situation quite similar to the case at bar. The District Court was concerned, among other things, with the taxpayer’s writeoff of its mass property accounts. Each account consisted of many units, all having the same function but having different probable lives. Typical of such property accounts were items such as wood poles or overhead lines of distribution. The taxpayer followed a method of writeoff which measured the useful lives of its properties in component groups. The Commissioner rejected that method. He proposed to substitute another method which utilized reconstructed average lives based upon certain extrinsic experience and evidence. The District Court held that the Commissioner was arbitrary and unreasonable in seeking to substitute his method of straight-line average life writeoff for the .taxpayer’s method of straight-line unit summation. It is of interest to note that the positions of the parties in the Portland General Electric case were the reverse of those in the instant case. Here it is the taxpayer, and not the Commissioner, who is arguing for a group procedure based on an averaging technique. We do not consider the District Court’s opinion to be support for petitioner’s position in the case at bar. In fact, we feel that there are even stronger reasons for rejecting in the instant case petitioner’s composite or group method than there were for rejecting the Commissioner’s analogous method in the Portland General Electric case. In that case the petitioner was was relying on a long history of past experience whereas the Commissioner relied only on extrinsic evidence developed by an engineer agent. In contrast, the petitioner in our case did not commence acquiring films until the years in issue. Consequently, in the instant case petitioner cannot allege that its method relied on a long history of past experience enjoyed by its station. Furthermore, as we have previously discussed, the films encompassed in a contract were quite diverse. Thus, we cannot look upon the films as being similar in the same sense as were the telephone poles of Portland General Electric Co. Petitioner submitted no evidence to support a further alternative method (e.g., the method approved in. KIRO, Inc., supra) to that upon which respondent’s determination is based. Accordingly, in view of our conclusions above, we must sustain that determination. Decision will be entered under Rule 50. All section references will hereinafter refer to the Internal Revenue Code of 1954 unless otherwise stated. SEC. 167. DEPRECIATION. (a) Geneeal Rule. — There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)— (1) of property used in the trade or business, * * * SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In Geneeal. — There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including— * * * * * * * (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. See also Tom F. Baker III, 38 T.C. 9, 13 (1962), in which we stated: “it may be observed that in reality, from a pure deduction standpoint, it makes no difference in tax liability whether a deduction from gross income is called a business expense and allowed under section 162 or depreciation and allowed under section 167. In fact, the cases show that the term given the allowance has been indiscriminately referred to sometimes as expense or amortization 7 and at other times as exhaustion or depreciation.8” (Footnotes omitted.) Composite or group accounting is generally used where assets are similar in kind. The leading advantage of the procedure is its simplicity in application. A single reserve can be used rather than separate reserves for numerous individual items.