COMPUTING & SOFTWARE, INC., SUCCESSOR BY MERGER TO COMPUTER CREDIT CORPORATION, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4008-72, 4009-72, 8184-74.     Filed May 15, 1975.

---

[1] The following cases are consolidated herewith: Computing & Software, Inc., successor by merger to Computer Credit Corporation, docket Nos. 4008-72 and 4009-72, and Cordura Corporation, formerly Computing & Software, Inc., successor by merger to Computer Credit Corporation, docket No. 8184-74.

*Mark Townsend,* for the petitioners.
*Stephen W. Simpson,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined that petitioners are liable as transferees under section 6901[2] for the following deficiencies in Federal income taxes in these consolidated cases:

| Docket No. | TYE | Deficiency |
|---|---|---|
| 4008-72 | Oct. 29, 1967 | $33,286.00 |
| | Nov. 3, 1968 | 211,850.00 |
| 4009-72 | Dec. 31, 1966 | 97,219.00 |
| | Aug. 30, 1967 | 63,862.00 |
| 8184-74 | Nov. 2, 1969 | 75,778.97 |

Petitioners do not dispute their liabilities as transferees if the underlying income tax deficiencies are due, but they contest the determined deficiencies, raising two issues:

(1) Whether certain credit information files purchased by petitioners or their predecessors are subject to a depreciation allowance under section 167 for the tax years at issue; and

(2) If so, whether the allowance may be computed under the 150-percent declining-balance method for computing depreciation.

### FINDINGS OF FACT

Petitioner Cordura Corp. is a corporation organized under the laws of the State of California with its principal place of business in Chicago, Ill., at the time of the filing of the petitions herein. Petitioner Computing & Software, Inc. (hereinafter C & S), became the Cordura Corp. upon approval of a name change by shareholder vote on or about March 2, 1973. At the time of the filing of the petitions herein, C & S's principal place of business was Century City, Calif.

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

The income tax returns herein involved were filed with the District Director of Internal Revenue at Los Angeles, Calif.

Consumer Credit Clearance, a sole proprietorship, was organized in 1942 for the purpose of serving as a credit information service. In 1963, all of the assets of Consumer Credit Clearance were sold to Hughes Dynamics, Inc. (hereinafter referred to as Hughes). Consumer Credit Clearance thereupon became a division of Hughes.

On December 17, 1964, Hughes sold its Consumer Credit Clearance division to Consumer Credit Clearance, Inc. (hereinafter referred to as CCC), a new corporation owned by Daniel Sperling and Sidney Morgan. The total purchase price was $2,050,000. The agreement of sale contained a covenant not to compete and an agreement not to divulge trade secrets. The agreement did not allocate this purchase price among the assets purchased, which included the goodwill and trade name of the seller.

The purchase price was allocated on CCC's books and records as follows:

| | |
|---|---|
| Total purchase price | $2,050,000.00 |
| Less: Imputed interest | 135,915.49 |
| Net purchase price | 1,914,084.51 |
| Allocation of purchase price: | |
| Credit file | [1] 1,715,000.00 |
| Furniture and fixtures | [2] 25,102.00 |
| Goodwill | 173,982.51 |
| Total | 1,914,084.51 |

[1] A valuation of the files for this purpose was made in May 1965, by a professional appraiser. The value was arrived at by sampling approximately 800 of the over 4,500,000 cards in the file in order to determine the useful life of the information then in the file. The useful life was based upon the purge criteria discussed in the text which follows. The appraiser determined that in 6 years, approximately 98 percent of the information in the file would be purged. By estimating the income attributable to the file to be $360,000 per year and by applying a 7-percent capitalization rate, the value of $1,715,000 was reached.

[2] Respondent does not challenge the value allocated to assets other than the files and goodwill.

The amount of $1,715,000 was entered on CCC's books as its basis in the credit file and depreciation was claimed thereon, computed by employing a useful life of 6 years and the 150-percent declining-balance method of depreciation.

On or about June 30, 1967, substantially all the properties and assets (including the credit file) and liabilities of CCC were transferred pursuant to section 368(a)(1)(C) to Computer Credit

Corp., a wholly owned subsidiary of C & S, in exchange for stock of C & S. CCC then changed its name to Sperling-Morgan Corp. and was dissolved. Its remaining assets, consisting solely of C & S stock, were distributed to its shareholders, Daniel Sperling and Sidney Morgan. Computer Credit Corp. carried over to its books the adjusted basis claimed by CCC in the credit file and continued to depreciate the file based upon the same life and same method of depreciation.

The largest and most important asset purchased by CCC from Hughes was the credit information file. The file included the names of individuals in Los Angeles and Orange Counties. It was contained in 60 steel file cabinets measuring 3' × 5', 3-tiered to the base, with 54 drawers per cabinet, each drawer being 18 inches deep. The file cabinets required approximately 5,000 square feet of space.

The credit file was composed of 3″ × 5″ blue inquiry cards and white legal cards. There were approximately 4,587,840 cards in the file: approximately 2,821,522 blue inquiry cards (61.5 percent), 1,610,332 white legal cards (35.1 percent), and about 156,986 other cards (3.4 percent).

The blue inquiry cards contained historical data, such as the debtor's name, age, wife's name, present address, previous address, whether the debtor owned or rented at his present address, his occupation, employer, employer's location, years employed, previous employers, bank account, credit references, date inquiry was made by the customer, and the customer code number. Some of the information was derogatory, such as "skip account," chargeoff, slow pay, or repossession. The derogatory information was not removed until the blue card was removed from the file.

The white legal cards were prepared and delivered on a daily basis by the Los Angeles Daily Law Journal and contained information relating to municipal and superior court suits, judgments, bankruptcies, Federal and State tax liens, notices of default on trust deeds, mechanics' liens, real estate attachments, law and admiralty suits, and chattel mortgages. Bankruptcy information, which composed less than 1 percent of all the legal cards, was recorded on a separate 3″ × 5″ card because this information was kept indefinitely.

CCC's credit-reporting business was structured as follows: file cabinets were located in the center of the office with clerks and

desks placed around the cabinets; when a customer telephoned for a credit report, he would give the clerk his code number and identifying inquiry information; the clerk would put him on "hold," search the credit file, return, and read back the available information to the inquiring customer; the customer would then call the previous inquiring members for a credit rating, utilizing the information given by CCC's clerk. The clerk would add to the credit information file any new data provided by the inquiring customer not already contained in the file. The date of inquiry and customer account number were noted on the card before it was returned to the file.

There were 150 to 200 clerks working in this office, receiving calls from inquiring customers, looking up names, and filing cards. On an average day 7,000 to 9,000 cards were pulled from and returned to the files. On a busy day approximately 10,000 to 12,000 cards were pulled.

The age of credit information is important to a credit grantor in deciding whether to grant credit to an applicant. The credit grantor is interested in current credit information. The credit seeker may have been a poor risk at some time in the past, but may be a grade A credit prospect today. Derogatory information is not valuable unless current. Old legal information has more value, but is not significant either. Stale information may actually mislead the credit grantor as to the present credit-worthiness of an individual who currently has an acceptable credit status.

In order to provide only current credit information, CCC had established purge criteria for discarding stale credit information. These criteria evolved from customer demands, since customers did not want to waste time on the telephone receiving stale information. Also, old inquiry information was worthless because when the inquiring credit grantor called a previous customer, that customer would no longer have a record of the old inquiry. Thus, when a customer called, the clerk would read the most recent information first and usually would not read any older, stale information.

The following purge criteria were furnished to the clerks: records of customer inquiries were considered obsolete when more than 3 years old; derogatory information was kept until the card was destroyed; and legal information was kept for varying periods. Thus, records of bankruptcies were kept indefinitely

(these constituted less than 1 percent of the legal cards), civil judgments for 10 years, municipal and superior court suits for 3 years, tax liens for 3 years, defaults on trust deeds for 3 years, chattel mortgages for 3 years, law and admiralty suits for 3 years, real estate attachments for 1 year, and mechanics' liens for 90 days.

Clerks were instructed to pull out and throw away old cards when searching the files pursuant to a customer inquiry. During slow periods, clerks would take a drawer from the file, sit at their desks, and throw away old cards, combine cards, or cross off stale information. This type of purging was a continuing process. Also, when new information came in as a result of an inquiry, the old card was thrown away, and the new card took its place in the credit file. Generally, if a card reflected no inquiries for 5 years, it was destroyed on the theory the subject had died or moved.

Information, besides being purged because of customer demands, was purged because of space problems and because the file was becoming so voluminous that the customer would be kept waiting while the search for information was conducted.

The types of customers that used the credit information service of CCC were banks, finance companies, stores, auto dealers, credit unions, and savings and loan companies, and included the May Co., Security Bank, United California Bank, Pacific Finance, and Household Finance.

Each customer had an account number, or code number, that was assigned to facilitate the credit-reporting system. Customers were listed in a code book by number, customer name, location, and telephone number. Each customer was mailed a copy of the code book for use in contacting previous inquiring customers for a credit rating. Some 2,500 to 3,000 customers had code books.

The credit-reporting business is extremely competitive. There were several credit-reporting agencies in the Los Angeles area which were competitors during the years in issue in this case, including CCC, Retail Merchants Credit Association, Retailers Commercial Agency (a division of Retail Credit Co. of Atlanta), TRW, the Santa Monica Credit Bureau, the Orange County Credit Bureau, the San Bernardino Credit Bureau, the Long Beach Credit Bureau, and various other small bureaus throughout the area.

Competition was magnified because there was no commitment by any customer to continue using a particular agency, nor did

the customers rely exclusively on any one credit-reporting agency. Credit managers buy credit information where it best serves their credit-granting purposes. Any continuing business relationship was premised upon the continuing accuracy and completeness of the file. As a result of the competition, CCC charged only 50 cents per inquiry, even though its competitors were charging as much as 85 cents per inquiry during the same period.

In order to enlarge its file and deal more effectively with competition, C & S decided to acquire the assets of other credit-reporting organizations. Retail Merchants Credit Association (hereinafter RMCA) was a credit-reporting bureau founded by a group of department stores at a time when little or no credit information was available in the Los Angeles area. RMCA sold credit information to retail stores, department stores, oil companies, banks, and installment credit stores.

The RMCA credit file was composed of about 1,800,000 active manual files that primarily contained derogatory information, and a computer file of approximately 6 million names. The manual files were 4″ × 6″ jackets, folded over like an envelope, and contained slips of paper with credit information written thereon. The information was both positive—such as the verification of an individual's address, employment data, telephone number, social security number, etc.—and derogatory.

On January 17, 1969, C & S purchased all of the assets of RMCA for a purchase price of $1,381,000. The contract did not allocate the purchase price among the assets acquired,[3] which included the goodwill and trade name of RMCA. The contract provided that RMCA would render its best efforts to retain its customers for the benefit of C & S.

The total purchase price was allocated by C & S on its books as follows:

| | |
|---|---|
| Credit file | $1,335,000 |
| Coupon inventory | 5,159 |
| Fixed assets | 38,741 |
| Deposit | 2,100 |
| Total | 1,381,000 |

[3] The contract did allocate $38,741 to the fixed assets acquired by C & S. Respondent does not challenge this allocation.

On January 17, 1969, the RMCA credit file was delivered to C & S's wholly owned subsidiary, Computer Credit Corp. The amount of $1,335,000 was used as its basis for the credit file, and depreciation was claimed thereon, using a useful life of 6 years and the 150-percent declining-balance method for the taxable year ended November 2, 1969.

Credit Data Corp., a credit information organization, bought the right to make a copy of the computerized portion of the credit file of RMCA for $500,000 just prior to the sale of the file to C & S. Credit Data Corp. was a computerized credit-reporting bureau and could utilize only the computerized credit information of RMCA. RMCA made full disclosure of the transaction to C & S prior to the conclusion of the RMCA and C & S negotiations.

On February 3, 1969, C & S purchased the assets of a sole proprietorship doing business as the Credit Bureau of Compton and Lynwood (hereinafter Compton) for a purchase price of $110,000. The purchase price included goodwill and the right to use the seller's trade name. In addition, certain collection files were also purchased. The total purchase price of $110,000 was allocated by C & S as follows: [4]

| | |
|---|---|
| Credit file | $106,800 |
| Furniture, fixtures, equipment | 3,200 |
| Total | 110,000 |

The Compton credit file was comparable to the RMCA manual file—it consisted of packets with slips of credit information inside. On or about February 3, 1969, the credit file was delivered to C & S's wholly owned subsidiary, Computer Credit Corp., as a contribution to its capital. The amount of $106,800 was entered on Computer Credit Corp.'s books as its basis for the credit file and depreciation was claimed thereon employing a useful life of 6 years and the 150-percent declining-balance method for the taxable year ended November 2, 1969.

CCC claimed depreciation deductions in the following amounts with respect to the credit files, which were disallowed in their entirety:

---

[4] As can be seen by petitioners' allocation, no amount was allocated to the collection files. These collection files produced $61,940 in gross income during 1968, while gross income from credit reporting was only $43,550. Nothing in the record indicates what action was taken by C & S with respect to the collection files. Respondent challenges neither that failure to allocate nor the $3,200 allocated to tangible property.

| TYE | Depreciation claimed and disallowed |
|---|---|
| Dec. 31, 1965 _____ | $254,187 |
| Dec. 31, 1966 _____ | 317,888 |
| Aug. 30, 1967 _____ | 119,208 |

Computer Credit Corp. claimed the following depreciation deductions with respect to the credit files and these deductions were also disallowed in their entirety:

| TYE | Depreciation claimed and disallowed |
|---|---|
| Oct. 29, 1967 _____ | $69,538.00 |
| Nov. 3, 1968 _____ | 191,229.00 |
| Nov. 2, 1969 _____ | 413,759.50 |

### ULTIMATE FINDINGS OF FACT

(1) The CCC credit files had an ascertainable value of $1 million[5] on the date of purchase, apart from goodwill and going-concern value.

(2) The RMCA credit files had a value of $750,000,[5] apart from goodwill and going-concern value.

(3) The Compton credit files had a value of $55,000,[5] apart from goodwill and going-concern value.

(4) Each of the credit files involved herein had a useful life of 6 years from the date of the respective acquisitions.

### OPINION

Section 167(a) provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, including obsolescence, of property used in a trade or business. The term "property" includes intangibles, and the ground rules for the allowance of the depreciation deduction for intangibles[6] are set forth in section 1.167(a)-3, Income Tax Regs., as follows:

---

[5] For the purpose of making these allocations, we accept respondent's concessions as to the allocations made by petitioners to the tangible property purchased in each case.

[6] Numerous court decisions have permitted deductions for the depreciation or amortization of intangibles. E.g., *Holden Fuel Oil Co. v. Commissioner,* 479 F. 2d 613 (6th Cir. 1973), affg. a Memorandum Opinion of this Court; *Commissioner v. Seaboard Finance Co.,* 367 F. 2d 646 (9th Cir. 1966), affg. a Memorandum Opinion of this Court; *First Pennsylvania Banking & Trust Co.,* 56 T.C. 677 (1971); *KIRO, Inc.,* 51 T.C. 155 (1968); *David Hoffman,* 48 T.C. 176 (1967).

Sec. 1.167(a)-3 Intangibles.

If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No deduction for depreciation is allowable with respect to goodwill. * * *

The amount of the depreciation deduction for intangibles, as in the case of other assets, is computed with reference to the taxpayer's basis in the property.

To qualify under the foregoing regulation for a depreciation deduction with respect to the credit information files acquired from CCC, RMCA, and Compton, petitioners must show that the credit information (1) had an ascertainable cost basis separate and distinct from the goodwill and going-concern value of the purchased businesses,[7] and (2) had a limited useful life, the duration of which could be ascertained with reasonable accuracy. The issues are basically factual. *Houston Chronicle Publishing Co. v. United States*, 481 F. 2d 1240, 1245-1251 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974); *Commissioner v. Seaboard Finance Co.*, 367 F. 2d 646, 649 (9th Cir. 1966), affg. a Memorandum Opinion of this Court; *Credit Bureau of Erie, Inc.*, 54 T.C. 726, 730 (1970).

We think petitioners have carried their burden of proof and are entitled to deductions, though in amounts somewhat smaller than the amounts claimed, for the depreciation or obsolescence of the credit information.

The credit files petitioners purchased from CCC, RMCA, and Compton were separate and distinct from the goodwill of those companies. The "nature of good will" is the expectancy that "the old customers will resort to the old place." *Commissioner v. Killian*, 314 F. 2d 852, 855 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; *Boe v. Commissioner*, 307 F. 2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961); see *Marsh &*

---

[7] The law is settled that the goodwill and going-concern value of a business is not subject to an allowance for depreciation. See, e.g., *Winn-Dixie Montgomery, Inc. v. United States*, 444 F. 2d 677, 685-686 (5th Cir. 1971); *Marsh & McLennan, Inc. v. Commissioner*, 420 F. 2d 667, 668 (3d Cir. 1969), affg. 51 T.C. 56 (1968); *United States v. Cornish*, 348 F. 2d 175, 185 (9th Cir. 1965). Cf. *Houston Chronicle Publishing Co. v. United States*, 481 F. 2d 1240, 1247 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974).

*McLennan, Inc. v. Commissioner,* 420 F. 2d 667 (3d Cir. 1969), affg. 51 T.C. 56 (1968) (insurance expirations); *Boe v. Commissioner, supra* (continuing contracts for medical care); *Thrifticheck Service Corp. v. Commissioner,* 287 F. 2d 1 (2d Cir. 1961), affg. 33 T.C. 1038, 1047 (1960) (customer contracts for check-processing services). The essence of the concept of goodwill is a preexisting business relationship, based on a continuous course of dealing, which may be expected to continue indefinitely. *Skilken v. Commissioner,* 420 F. 2d 266, 268 (6th Cir. 1969), affg. 50 T.C. 902 (1968). Thus, the useful life of goodwill is not susceptible to reasonable estimation.

In contrast, the purchased credit information had no direct relationship to preexisting or continuing business relationships. The same kind of information was furnished under the same procedures to new and old customers alike. In a real sense, that information was the product petitioners sold, and the files were the tools used by petitioners in making needed information available to their customers.

According to the testimony, a customer (a department store or other business establishment, for example) would call petitioners, seeking the information needed to enable the customer to decide whether to extend credit to an applicant. One of petitioners' 150 to 200 clerks would give the customer the information contained on the blue, white, and other cards, described in our Findings, with respect to the applicant. This information included such data as the applicant's occupation, place of employment, period of employment, bank connections, credit references, home ownership, credit experience, participation in court proceedings, and the like. For this service, the customer would pay petitioners a fee.

Thus, the credit information files were the primary productive asset of the businesses and not merely a reflection of their goodwill. Without this information, kept on cards, stored in computers, or maintained in some other systematic form, petitioners' credit-reporting businesses simply could not be operated.

Moreover, the credit information, unlike goodwill, has value for only a limited period. An applicant's credit-worthiness may be affected one way or the other by employment and salary changes, credit performance, judgments, liens, bankruptcies, and other factors. These records must be kept up to date because stale credit information can be seriously misleading.

Respondent contends that the whole bundle of contract rights acquired from CCC, RMCA, and Compton was an "indivisible mass" asset, so interlinked with goodwill that no part of the cost could be assigned to the files. We do not agree. Generally speaking, the indivisible asset theory has been used in cases where the principal purchased asset was a customer list or a similar item which had an indefinite life. *Commissioner v. Seaboard Finance Co.,* 367 F.2d at 652; *First Pennsylvania Banking & Trust Co.,* 56 T.C. 677, 691 n. 8 (1971); *KIRO, Inc.,* 51 T.C. 155, 168 n. 8 (1968). The theory is designed to prevent a taxpayer from allocating to relatively insignificant depreciable assets the price actually paid for nondepreciable intangibles.[8] It is not intended to be used to deny an allocation of a part of the purchase price to depreciable property where such property is a major factor in the transaction.

There remains the problem of allocating the purchase price paid for each organization. In the transactions whereby petitioners acquired the credit information files of CCC, RMCA, and Compton, petitioners also acquired other assets. With one limited exception,[9] the purchase contracts did not allocate the price among the individual elements. Petitioners allocated $1,715,000 out of a total purchase price of $2,050,000 to the CCC credit information file, $1,335,000 out of a total purchase price of $1,381,000 to the RMCA file, and $106,800 out of a total purchase price of $110,000 to the Compton file. Of the CCC purchase price, approximately $173,000 was allocated to goodwill, and no part of the RMCA and Compton costs was allocated to goodwill.

We think a substantially smaller portion of the purchase price than the amounts claimed by petitioners should be allocated to the credit files. Without attempting to distinguish goodwill from going-concern value,[10] *Winn-Dixie Montgomery, Inc. v. United*

---

[8] In *Manhattan Co. of Virginia, Inc.,* 50 T.C. 78, 90 (1968), this Court said:

"Generally, the 'indivisible asset' reasoning has been used in cases where a taxpayer acquired a going concern with the primary value of the acquisition being goodwill and going-concern value. In such cases courts have generally refused to sort out some small portion of the asset acquired which might be of a wasting nature."

[9] The parties to the RMCA contract allocated $38,741 to the fixed assets acquired by C & S.

[10] Going-concern value as distinguished from goodwill "is bottomed on the ability of the acquired business to generate sales without any interruption because of the takeover." *Winn-Dixie Montgomery, Inc. v. United States,* 444 F. 2d at 685 n. 12; *United States Industrial Alcohol Co. v. Helvering,* 137 F. 2d 511, 513 (2d Cir. 1943).

*States,* 444 F. 2d 677, 685 (5th Cir. 1971), we think both were important elements in the acquisitions. The CCC purchase contracts contained a covenant not to compete or divulge trade secrets and a provision transferring the trade name. The fact that the trade name was utilized shows that goodwill was transferred. The RMCA contract of sale contained a covenant not to compete and a promise to render best efforts to maintain customers for petitioners' benefit. Although Compton was operating at a loss, it too was a going concern with a staff and an established clientele which were transferred along with the files.

Moreover, each of these purchases involved an ongoing business—an organization that was doing business and earning money; a network of customers and the expectation that their patronage would continue; a staff of employees trained in working with the credit files and dealing with the organization's customers; an established routine for supplying available credit information and obtaining and recording new data from various sources; and an established routine for recording the fees charged for credit-reporting services and billing the customers. Petitioners were able to continue to provide services to the customers of the acquired businesses without interruption because of the takeover. The portion of the price attributable to these factors is nondepreciable.[11] *Northern Natural Gas Co. v. United States,* 470 F. 2d 1107, 1110 (8th Cir. 1973), cert. denied 412 U.S. 939 (1973); *United States v. Cornish,* 348 F. 2d 175, 185 (9th Cir. 1965); *Winn-Dixie Montgomery, Inc. v. United States, supra* at 685; see *Commissioner v. Seaboard Finance Co., supra* at 650-651; cf. *Texas-Empire Pipe Line Co.,* 10 T.C. 140 (1948), affd. 176 F.2d 523 (10th Cir. 1949).

While the record does not contain a fully satisfactory formula for allocating among their several elements the amounts paid for these three organizations, we think such an allocation is required. In the light of all the evidence, we have made the allocations contained in our Ultimate Findings. *Cohan v. Commissioner,* 39 F. 2d 540 (2d Cir. 1930); *Commissioner v. Seaboard Finance Co., supra* at 652.[12]

---

[11] It is noteworthy that Credit Data Corp., another credit information agency, merely copied the information it needed from the RMCA files. If that were all petitioners needed, they could have followed the same procedure at less cost.

[12] As stated by Judge Friendly in *Commissioner v. Ferrer,* 304 F. 2d 125, 135 (2d Cir. 1962), revg. in part and remanding in part 35 T.C. 617 (1961):

"In such instances, where part of a transaction calls for one tax treatment and another

Having established a depreciable basis for the files, we proceed to the second requirement—a limited useful life. We find that petitioners have provided more than ample support for a 6-year useful life for each of the files. The record contains substantial testimony that only current credit information has value to credit grantors. For this reason, petitioners established and implemented the purge criteria described in our Findings. According to credible testimony, the credit information purchased by petitioners will become substantially obsolete within the 6-year period. This evidence goes far beyond the "unsupported opinion of the taxpayer." Sec. 1.167(a)-3, Income Tax Regs.

On the theory that the files are self-regenerative, respondent contends that the useful life of the information acquired by petitioners is indefinite. Respondent points out that once an individual's name was placed in the file, that name remained in the file as long as inquiries which added new information about that individual were received. Respondent emphasizes the importance of the correlation of names of individuals in the files with information concerning those individuals, since credit grantors required information linked to a name, not information in a vacuum. Because the linkage between a name and information is of paramount importance, respondent maintains that the usefulness of the file does not dissipate when information changes, as long as the individual's name associated with the information remains part of the file. Since an individual's name may remain in the file indefinitely, the useful life of the file is also unlimited.

Respondent's argument, however, ignores the fact that the issue here deals only with the credit information purchased from CCC, RMCA, and Compton. The newly recorded information is not in dispute. The salaries of the clerks recording the new information were deducted as current expenses. The files containing the purchased information were purged constantly of obsolete data and cards on individuals on which no inquiries had been received in accordance with the purge criteria described in

---

for a different kind, allocation is demanded * * *. If it * * * is asking the Tax Court to separate the inseparable * * * no one expects scientific exactness; * * * however roughly hewn the decision may be, the result is certain to be fairer than either extreme * * *"

our Findings. Under those criteria, 98 percent of the information in the file would be purged within 5 to 6 years.

The remaining issue is whether petitioners are entitled to depreciate the purchased credit information under the 150-percent declining-balance method. We hold they have not made the requisite showing.

Section 167(a) provides for the deduction of a "reasonable allowance" for depreciation without specifying the method of computation. Section 167(b)[13] prescribes a nonexclusive list of four permissible methods for computing the "reasonable allowance," but section 167(c)[14] indicates that the three methods other than the straight-line method listed in section 167(b) do not apply to intangible property. *Panhandle Eastern Pipe Line Co. v. United States,* 187 Ct. Cl. 129, 408 F. 2d 690, 699 (1969); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 202 (1954).

The listing of the four methods in section 167(b) is not intended to limit depreciation of intangibles to the straight-line method if another method will give petitioners a more reasonable depreciation allowance. In other words, the "use of the straight-line method is not compulsory if it does not produce a 'reasonable allowance for the exhaustion' " of the useful life of the purchased credit information. *KIRO, Inc.,* 51 T.C. at 168; see *Tribune Publishing Co.,* 52 T.C. 717 (1969), affd. per curiam 451 F. 2d 600 (9th Cir. 1971).[15]

---

[13] SEC. 167. DEPRECIATION.

(b) USE OF CERTAIN METHODS AND RATES.—For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

(1) the straight line method,

(2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),  .

* * *

Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a).

[14] Sec. 167(c) states:

(c) LIMITATIONS ON USE OF CERTAIN METHODS AND RATES.—Paragraphs (2), (3), and (4) of subsection (b) shall apply only in the case of property (other than intangible property) described in subsection (a) with a useful life of 3 years or more—

(1) the construction, reconstruction, or erection of which is completed *after* December 31, 1953, and then only to that portion of the basis which is properly attributable to such construction, reconstruction, or erection after December 31, 1953, or

(2) acquired after December 31, 1953, if the original use of such property commences with the taxpayer and commences after such date.

[15] We need *not* decide the difficult question whether sec. 167(c) forbids the use of the

Petitioners argue that the 150-percent declining-balance method produces a "reasonable allowance" in this case. We think the evidence fairly shows that new or current credit information is more valuable than older information and, as discussed above, the information in the purchased files would become obsolete at the end of 6 years. On this theory, petitioners may reasonably argue that some form of accelerated depreciation is justifiable. But the evidence does not show any correlation between the annual depreciation or obsolescence of the purchased credit information and the deductions computed under the declining-balance method. Petitioners did not produce evidence, for example, similar to the contract formula on which the Court based its decision in *KIRO, Inc., supra.* Since the declining-balance method has not been shown to produce a reasonable allowance, petitioners must use the straight-line method in computing the allowable deduction.[16]

To reflect the foregoing conclusions,

*Decisions will be entered under Rule 155.*

declining-balance method listed in sec. 167(b)(2) in computing the depreciation of intangibles under all circumstances, or whether this method is permissible under sec. 167(a) as a "reasonable allowance," since we hold that petitioners have not shown that the declining-balance method would produce a reasonable allowance in this case.

[16] In their reply brief, petitioners argue for the first time that the credit information files were tangible rather than intangible property and, therefore, sec. 167(c) is applicable, citing *Walt Disney Productions v. United States,* 327 F. Supp. 189 (C.D.Cal. 1971), affd. and modified 480 F. 2d 66 (9th Cir. 1973), cert. denied 415 U.S. 934 (1974). While we need not consider this argument, *Estate of Dorothy E. Beck,* 56 T.C. 297, 347 (1971), we think it lacks merit. The essence of the asset acquired by petitioners was the credit information contained in the files, not the files as such, and that information was obviously intangible property. In addition, sec. 167(c)(2) limits the use of the declining-balance method referred to in sec. 167(b)(2) to property of which, among other things, "the original use * * * commences with the taxpayer." If petitioners' new position were correct, moreover, it would undermine their contention that the credit information recorded in the files becomes obsolete within the 6-year period.