AMERICAN INTERNATIONAL COAL CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
American International Coal Co. v. Commissioner
Docket No. 14574-79.
United States Tax Court
T.C. Memo 1982-204; 1982 Tax Ct. Memo LEXIS 545; 43 T.C.M. (CCH) 1097; T.C.M. (RIA) 82204; April 15, 1982. Roy J. Roscoe, for the petitioner. Edward F, Peduzzi, Jr., for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSON, Judge: Respondent determined a deficiency in the amount of $ 21,975.87 in petitioner's Federal income tax for 1975. The sole issue [1] for decision is whether petitioner, a corporation, paid Stephen C. Levitt, an employee and shareholder, $ 54,800 as deductible compensation for services or as a nondeductible distribution in redemption of his stock. *546 FINDINGS OF FACT Petitioner, American International Coal Co., Inc., had its principal office in Pittsburgh, Pennsylvania, when the petition was filed. Petitioner filed its Federal income tax return for 1975 with the Philadelphia Service Center. On December 5, 1974, Robert L. Todd (Todd), Stephen C. Levitt (Levitt), and Richard C. Schomaker (Schomaker) entered into a preincorporation agreement in which they agreed to form a corporation to be known as American International Coal Company, Inc., to conduct a coal mining and brokering business. Each party was to contribute to the corporation "all business contacts, contracts and any and all rights pertaining to coal" excepting two coal contracts specifically reserved by Todd. Article 3 of the agreement provided that: If any party to this Agreement performs services in excess of those services rendered by the other shareholders, he shall be compensated on a reasonable basis in addition to his proportion of the net profits. As to the division of net profits, Article 4 of the agreement provided that: "All net profits, after expenses, shall be divided equally among the shareholders." All business decisions were to be made by *547 a majority vote of the shareholders. Of the three incorporators, Todd was the only one with previous experience in the coal business. He arranged for operating capital, and he was expected to handle activities in the coal fields. Levitt was to be responsible for day-to-day operations, and Schomaker was to serve as legal counsel. Levitt and Schomaker as cosigners were authorized to write checks for the business from a checking account opened by Levitt. After petitioner's incorporation on December 24, 1974, the preincorporation agreement was ratified by the corporation in all respects except as to Todd. Because Todd was believed to have misapplied some funds, he was not permitted to become an officer or shareholder, but he served as a "probationary employee" until March or April 1975. Levitt and Schomaker became the original and only shareholders, each owning 50 percent (1,000 shares each) of the stock. Levitt devoted much of his time to the work of the corporation from the outset. Beginning May 1, 1975, he became a full-time employee of petitioner with an office in his home, receiving a salary of $ 400 per week plus the use of a car and hospitalization insurance. The salary *548 received by Levitt during 1975 totaled $ 8,600. For his legal services to petitioner, Schomaker received $ 1,800 prior to September 23, 1975, and $ 5,600 for the remainder of the year, a total of $ 7,400. During 1975, the first year of its operations, petitioner was engaged only in the business of supplying coal under contract, i.e., the brokering of coal. Petitioner neither owned nor operated any coal mining or coal processing facilities but bought for resale coal mined by others. During the period January 1975 to March 1, 1975, petitioner procured three contracts to ship coal as follows: (1) A contract with West Penn Power Company (West Penn) for its Hatfield Ferry Power Station; (2) a "contract" with H.J. Heinz Company to ship on a purchase order basis; and (3) a contract with United States Steel Corporation. All of these contracts expired on or before August 30, 1975. On March 20, 1975, petitioner entered into a contract with West Penn to supply its Armstrong Power Station with approximately 20,000 tons of coal per month, during the period beginning April 1, 1975, and ending December 31, 1978. Petitioner was to receive a base price of 92.5 cents per million Btu for coal *549 having a base heating value of 12,000 Btu per pound. Clause 6 of the contract provided that, on or before November 1 during each year of the contract, negotiations could be had for base price adjustments or for termination of the contract. Prior to the execution of this West Penn contract, Todd advised Levitt and Schomaker that West Penn planned to let long-term contracts for coal. In order to obtain a coal supply for such a contract, Levitt negotiated a deal with Shaw Coal Company (Shaw) to supply a quantity of coal equal to the amount ultimately called for in the West Penn contract. The agreement with Shaw was, in effect, a duplicate of petitioner's contract with West Penn except for changes in the designation of the parties and a 10-cent reduction in the base price. Without the arrangements for a supply of coal from Shaw, West Penn most likely would not have awarded the contract to petitioner, and petitioner would not have committed itself on a supply contract of such magnitude. Shortly after the West Penn contract became effective, Shaw defaulted on its agreement and stopped delivering coal to petitioner. Levitt then entered the spot market for coal and obtained sufficient *550 tonnage on open-ended purchase orders to enable petitioner to meet its contract commitment to West Penn. Although the spot market purchase arrangement caused petitioner's brokerage business to take larger risks, Levitt was successful in establishing a good working relationship with several suppliers. In fact, buying coal from these suppliers and reselling it to West Penn was proving more profitable than the arrangement would have been under the Shaw contract. Levitt believed that the company was going to grow and increase in profitability. Petitioner's business was doing well under Levitt's management until September 23, 1975. On that date, without an opportunity for Schomaker to make arrangements for someone to succeed Levitt, Levitt was taken into protective custody under the Federal witness protection program. Levitt has no prior warning that he would be required to enter Federal custody. He spent September 24, 1975, making arrangements to sell his property and terminate his business affairs. Without a balance sheet, profit and loss statement, or an audit of petitioner's financial situation, Levitt concluded on a review of the receivables, payables, and cash in the checking *551 account that the corporation at that time had a "plus" position of something over $ 100,000. In other words, if petitioner had paid all its bills and collected all the money due to it at the time, petitioner would have been ahead approximately $ 100,000. As a result of this examination of the books, he decided that he "wanted $ 50,000" for his interest in the company. In making his computations, he did not take into account a liability to Page Coal Company on a $ 24,000 judgment note and did not consider the Federal tax liability of petitioner. Levitt prepared a check (No. 1364) dated September 24, 1975, payable to himself and drawn on petitioner's account in the amount of $ 50,000 which, to be negotiable, required Schomaker's counter signature. On the check stub, he placed the words "For the purchase of the stock of Stephen C. Levitt." On behalf of Levitt, a messenger presented the check to Schomaker for his countersignature on September 25, 1975. Schomaker refused to sign it at that time. On September 25, 1975, Levitt, through agents of the Federal Bureau of Investigation, retained Robert J. Cindrich (Cindrich), an attorney, to represent him in handling his civil affairs. *552 Levitt reviewed his financial affairs with Cindrich, including the need to terminate his interest in petitioner. Later, Levitt and Schomaker had a brief private meeting during which Schomaker advised Levitt that he could not sign the $ 50,000 check "the way it was." It was agreed that Cindrich would conclude the negotiations for terminating Levitt's interest in petitioner. On Cindrich's recommendation, Levitt gave his brother-in-law, Richard M. Handler (Handler), a general power of attorney authorizing him to (among other things) sell Levitt's real estate, stocks, bonds, and other property. Levitt left the City of Pittsburgh in the protective custody of the United States Department of Justice on the night of September 25, 1975. Subsequently, Cindrich and Schomaker met to discuss the termination of Levitt's interest in petitioner. Before this meeting was held, Schomaker examined petitioner's books and concluded that petitioner's net profits exceeded $ 70,000 without regard to the judgment note held by Page Coal Company. Schomaker offered to make a payment to Levitt which would for the most part be characterized as a "commission" rather than as a payment for stock. Cindrich *553 did not attempt to negotiate the point, but simply communicated the offer to Levitt who expressed satisfaction with its even though Cindrich advised him that the payment was to be reported for tax purposes as ordinary income. Subsequently, Cindrich drafted two documents, one entitled "Termination Agreement" and the other "Agreement of Sale." The Termination Agreement, dated October 3, 1975, describes Levitt as "Employee" and petitioner as "Employer," and it recites that "Employee is entitled to commissions" on "various sales of coal on behalf of Employer which have resulted in earnings and profit to Employer." The Termination Agreement provides: 1. On or before the 3rd day of October, 1975, Employer shall pay to Employee the sum of FIFTY THOUSAND ($ 50,000.00) DOLLARS in cash, certified or cashier's fund, which said sum shall be in partial payment of commissions due Employee for services rendered to Employer. 2. In addition to the sum of FIFTY THOUSAND ($ 50,000.00) DOLLARS as set forth in Paragraph 1, Employer shall pay to Employee the sum of TWELVE THOUSAND ($ 12,000.00) DOLLARS payable at the rate of TWO HUNDRED ($ 200.00) DOLLARS per week for each and every week, commencing *554 on the week beginning Monday, October 6, 1975, without interest on unpaid principle [sic] balance due. 3. Employee agrees to accept the sum set forth in Paragraphs 1 and 2 as full and complete satisfaction of any and all amounts due to him from Employer for services rendered in connection with Employer's coal brokerage business. The Agreement of Sale, by its terms, provided that Levitt agreed to sell to petitioner 1,000 shares of the common capital stock of petitioner in consideration of $ 1,000 ($ 1.00 per share). The purchase price was to be paid by petitioner's cancellation of a $ 1,000 promissory note signed by Levitt in petitioner's favor upon the distribution to Levitt of the initial capital stock. On October 3, 1975, these two agreements were signed by Schomaker on behalf of petitioner and by Handler on behalf of Levitt. On or about that same day, Schomaker countersigned the $ 50,000 check (No. 1364). When he countersigned it, he changed the notation on the check stub by crossing out the words "For the purchase of the stock of Stephen C. Levitt" and substituting the word "Commissions." In addition, Schomaker crossed out the original entry in petitioner's check register *555 for check No. 1364 under a column headed "In payment of" in which Levitt had entered "Purchase of stock," and he inserted the word "Commissions." He then delivered the check to Cindrich for transmittal to Levitt. After Levitt's departure, Schomaker all but abandoned his law practice and devoted most of his time to the conduct of petitioner's business. On November 1, 1975, Schomaker decided to continue the West Penn contract without attempting to negotiate a price adjustment. Sometime after November 1, 1975, petitioner employed Jack Sedlack (Sedlack), who has some background in the coal business, to assist in managing petitioner's business operations. Schomaker and Sedlack were able to obtain a supply of coal sufficient to enable petitioner to continue to service the West Penn contract. Between October 3, 1975, and December 31, 1975, Schomaker and Levitt had several conversations, some by telephone and at least one in person. In these conversations, they discussed various problems facing petitioner, including that of maintaining its coal supply. Levitt also wrote several letters to Schmaker concerning various business matters related to petitioner. Beginning in October *556 1975, petitioner paid Levitt $ 1,600 per month for 3 months, a total of $ 4,800, plus the $ 50,000 check. On its income tax return for 1975, petitioner deducted the total payment of $ 54,800 to Levitt as commissions. In the notice of deficiency issued to petitioner, respondent disallowed the deduction. The notice of deficiency reflects that for 1975 petitioner had taxable income as revised by respondent in the amount of $ 80,824.54. This figure takes into account the denial of the $ 54,800 deduction here in dispute as well as a deduction of a theft loss in the amount of $ 4,025, conceded by petitioner in this case. On petitioner's Pennsylvania Corporation Income Tax Return for 1975, the stated value of petitioner's common stock for purposes of the Pennsylvania capital stock tax was $ 20,000. Petitioner's Federal income tax returns for 1976, 1977, and 1978 show net profits from its coal business totaling well in excess of $ 1 million for that 3-year period. OPINION The issue to be decided is the deductibility of the $ 54,800 that petitioner paid to Levitt during the period in 1975 following Levitt's departure from Pittsburgh. Petitioner argues that this amount was paid *557 pursuant to the October 3, 1975, Termination Agreement as compensation for past services and for current and future consultation services for which it is entitled to a deduction under section 162(a)(1). [2] Respondent, however, maintains that the Termination Agreement is a facade to cloak a tax avoidance scheme whereby petitioner seeks a deduction from ordinary income for amounts paid to redeem Levitt's stock. If the $ 54,800 in issue was, indeed, compensation for services, it would be deductible by petitioner, as it contends, and would be taxable to levitt as ordinary income. [3] On the other hand, if it was paid to redeem *558 Levitt's stock in petitioner, the payment would not be deductible by petitioner and would be taxable to Levitt as capital gain. These countervailing tax interests of the parties in the ordinary case would tend to deter artificial arrangements. Cf. Schulz v. Commissioner,294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); Ullman v. Commissioner,264 F.2d 305, 307 (2d Cir. 1959), affg. 29 T.C. 129 (1957). But it is an elementary rule of tax law that in proper cases the Commissioner may look beyond the formal docufments and assert taxability upon the substance and reality of the transaction. Higgins v. Smith,308 U.S. 473 (1940); Griffiths v. Commissioner,308 U.S. 355 (1939). That is what respondent maintains he has done here. The issue presented is factual. In the light of the entire record, we conclude that $ 50,000 of the agreed $ 62,000 payment was paid to redeem Levitt's stock. As to the remaining $ 12,000, only $ 4,800 *559 of which was paid in 1975, the issue is close, but on the record before us we hold that it was paid as compensation for consultation services. 1. The $ 50,000 Check
To support its theory that the entire $ 62,000 payment was to be made for Levitt's services, petitioner relies upon the Termination Agreement, quoted in part in our findings, which describes the payments therein provided as "commissions" due Levitt "for services rendered." By the terms of this agreement, Levitt agreed to accept a total of $ 62,000 "as full and complete satisfaction of any and all amounts due to him" from petitioner "for services rendered" in petitioner's coal brokerage business. This agreement, petitioner argues, gains economic substance from the preincorporation agreement of December 5, 1974, which provided that, if one shareholder performed services in "excess" of those services rendered by the other shareholders, he would be "compensated on a reasonable basis in addition to his proportion of the net profits." Petitioner points out that Levitt devoted at least a substantial amount of his time to petitioner's business from January 1 to May 1, 1975, the devoted his full-time from May 1, 1975, to *560 the date of his departure from Pittsburgh on September 25, 1975, receiving total compensation of only $ 8,600. In the meantime, Schomaker, the other shareholder, served as petitioner's attorney and received a total amount of $ 1,800 for his services while continuing his law practice prior to September 24, 1975. As evidence of Levitt's valuable services prior to his departure, petitioner maintains that Levitt, through his efforts and work, was "solely responsible for the success of American's [petitioner's] profits in excess of $ 70,000 or $ 100,000." Petitioner also emphasizes Levitt's role in obtaining the West Penn contract which provided for potential coal sales of approximately $ 20,000,000. To obtain coal to service this contract, Levitt had initially contracted with Shaw and, when Shaw failed to perform satisfactorily, he had arranged for coal on open-ended purchase orders with several suppliers. This purchase order arrangement was working well on September 23, 1975, when Levitt entered the protective custody of the U.S. Department of Justice. Many of the facts cited by petitioner to show the value of Levitt's services, however, tend also to show that petitioner's stock *561 had substantial value when Levitt left Pittsburgh, and they indicate that most (if not all) of the payment called for in the Termination Agreement was, in fact, paid to redeem his stock. As of September 23, 1975, petitioner had a going brokerage business with assets which included the West Penn contract and arrangements with at least six suppliers who, in 1975, had abundant quantities of coal available to enable petitioner to service that contract. From the approximately $ 20,000,000 in sales reasonably expected to be made under the contract, Levitt testified that, if things went well, he had "figured" petitioner "should have" a gross profit (before taxes, operating expenses, and overhead) of $ 1,000,000 on the basis of a "pretty standard" 5-percent commission "in the coal business." Levitt's presence was not essential to the continued viability of the West Penn contract, the source of most of petitioner's income. This going-concern value--"the ability of a business to continue to function and generate income without interruption as a consequence of the change in ownership," VGS Corp. v. Commissioner,68 T.C. 563, 592 (1977); *562 Computing & Software, Inc. v. Commissioner,64 T.C. 223, 235 (1975)--shows that the business, which had netted $ 70,000 to $ 100,000 in 9 months, had substantial value. It demonstrates that the cancellation of Levitt's $ 1,000 note, purportedly in redemption of Levitt's stock, had little relationship to the stock's value. [4] True, with Levitt's abrupt departure, the business would require prompt attention by some other full-time manager, but the subsequent success enjoyed by Schomaker, assisted by Sedlack, in managing the business demonstrates that the problem was not insurnountable. [5]
*563 Petitioner would have us treat the preincorporation agreement as if it were a contingent compensation agreement of the kind described in section 1.162-7(b)(2), Income Tax Regs.; [6] see, e.g., Lewisville Investment Co. v. Commissioner,56 T.C. 770 (1971). On this basis, petitioner would have us conclude that Levitt was entitled to additional compensation for services because he had obtained the West Penn contract and devoted more time and effort than Schomaker to petitioner's business prior to September 24, 1975. We think this argument misapprehends the effect of the preincorporation agreement. *564 Significantly, the preincorporation agreement was originally drafted as a "Preliminary Limited Partnership Agreement" between Levitt, Todd, and Schomaker and was then modified by pen and ink changes to a "Pre-Incorporation Agreement." In addition to providing for a shareholder to be compensated on a reasonable basis for services in excess of the services rendered by the other shareholders, it provided for an equal division of the profits and for all business decisions to be made "by a majority of the shareholders [including Todd], all of whom shall be entitled to vote." It thus implicitly provided for an equal three-way division of the corporation's stock. Because Levitt and Schomaker concluded that Todd had improperly used business funds prior to the issuance of the stock, Todd was denied any stock in the corporation and, apparently, on that ground was denied the right to participate in business decisions, to share in post-incorporation profits, or to be paid for preincorporation services in excess of the services of the other shareholders. There is no evidence to indicate in what other respects the preincorporation agreement was modified as between Levitt and Schomaker when *565 Todd was frozen out. While there is testimony, and we have found, that the agreement was ratified and approved by the corporation except as to Todd, the record does not show on what terms. But even if the agreement did survive, we think it was not a continuing contingent compensation agreement. It was merely an agreement that each shareholder would be paid reasonable compensation for his "excess" services in initiating the business. Further, as we view the evidence, reliance on the preincorporation agreement to explain the Termination Agreement is an afterthought. The Termination Agreement makes no reference, in the words of the preincorporation agreement, to "services in excess of those services rendered by the other shareholders." The preamble of the Termination Agreement [7] recites that Levitt had "consummated various sales of coal" on behalf of petitioner "which have resulted in earnings and profit" to petitioner and that Levitt is "entitled to commissions on said sales." Consistent with these recitations, the check paydable to Levitt and the entry in the check registry written by Levitt when he prepared the $ 50,000 check were modified by Schomaker when he countersigned *566 the check to indicate the payment was made for "commissions." The preincorporation agreement makes no reference to commissions. None of petitioner's actions at the time of the settlement with Levitt appear to have been taken on the theory that he was entitled under the preincorporation agreement to additional compensation for services in excess of the services performed by the other shareholders. When Levitt found out that he was going to be forced to leave Pittsburgh, moreover, he examined petitioner's books and concluded *567 that "the company was in a plus position in excess of $ 100,000" if it paid all the bills and collected its receivables. On that basis, he decided that he "wanted $ 50,000 for * * * [his] interest in the company" and that $ 50,000 would be fair" for his interest. [8] To that end, at a time when he was effectively sealed off from outside contacts with anyone, Levitt prepared and signed a $ 50,000 check (which required Schomaker's countersignature) payable to himself, writing on its face that it was for the "purchase of stock" and making corresponding entries in petitioner's books. [9] That same check was ultimately countersigned by Schomaker and delivered to Levitt, altered on its face only to show that it was for "commissions" rather than for the purchase of his stock. *568 From May 1, 1975, to September 24, 1975, Levitt was a full-time employee receiving as compensation a salary of $ 400 per week, use of a car, and a hospitalization insurance policy. Levitt made no claim for any additional compensation for past services at any time. In fact, he testified that he felt that he "had been compensated fairly up to that point." He further testified that if he had stayed with the company he anticipated that "we would take the profits that were left in the company and I would get my share and he [Schomaker] would get his share" as the end of 1975. [10]
*569 Petitioner would have us discount this testimony because, he argues, Levitt initially took the position that he should be paid $ 50,000 for his stock rather than additional compensation only to obtain the more favorable capital gain treatment of his receipts. We think it quite inconceivable that Levitt gave tax consequences any real consideration at a time when he was abruptly taken into Federal custody and was faced with having himself and his family uprooted and removed to some other city where they would take a new identity and start life all over again. We think he was truthful when he testified that, as to tax consequences, he "did not care." [11]
It is true that Levitt's attorney-in-fact, Handler, *570 executed the Termination Agreement describing the $ 50,000 payment as "partial payment of commissions * * * for services rendered" and the Agreement of Sale describing cancellation of the $ 1,000 note as consideration for the sale of his stock. It is also true that Levitt in 1979 signed a "Certification" that "all payments" received from petitioner during October 1975 and thereafter were "ordinary commissions/income subject to ordinary income tax," not in payment for his stock, and that the "actual sale of * * * [his] stock was carried out by cancellation of a $ 1,000 judgment note" against him. Levitt also signed a "Supplemental Certification" in 1980. These certifications, which were apparently signed for petitioner's use in handling this case when it was before the Internal Revenue Service, tend to discredit Levitt's testimony to some extent; but, taking into account his explanation of the circumstances in which they were signed, they do not create serious doubts as to his testimony on the crucial facts reviewed in the foregoing discussion. Levitt testified that when he learned he would be required to leave Pittsburgh, he was concerned about his need for cash. He retained *571 Cindrich to represent him in closing his business affairs. Cindrich went to Levitt's home, and Levitt told him he wanted $ 50,000 for his interest in petitioner. After a later meeting with Schomaker, Cindrich drafted the Termination Agreement and Agreement of Sale. Cindrich testified that these agreements were not the product of any negotiations he had with Schomaker. Rather, Schomaker told him what the terms of the agreement, including the characterizations of the payments, were to be. He later communicated the terms to Levitt, including an explanation of the income tax consequences of such characterizations, and Levitt told him he did not care whether or not the payments were characterized as ordinary income. Because Levitt knew more about the value of petitioner's business than anyone else and was "perfectly willing, so long as he could get his money, to take it in that fashion," Cindrich did not attempt to negotiate the point. Levitt testified that cindrich explained that, it view of the terms of the Termination Agreement, he should report the payments from petitioner as ordinary income, and he did so. The certifications that he signed merely followed the terms of the *572 Termination Agreement and reflected the manner in which he had reported the payments from petitioner in his income tax returns. We do not think the certifications alter the facts that Levitt, who admittedly knew more about the company that anyone else, though his interest in petitioner was worth $ 50,000, asked to be paid that amount, and received it. Petitioner emphasizes a long list of claims, possible claims, and potential claims against it which might have altered Levitt's approximation of its cash position, but we think the evidence shows that those posible claims were fully offset by petitioner's going-concern value, reflected in large part by the West Penn contract to which petitioner points in describing Levitt's valuable services. Moreover, the evidence shows that Schomaker did not at any time question the reasonableness of the amount requested by Levitt, but only the characterization of that amount. Based on a totality of the evidence, we hold that the Termination Agreement and accompanying Agreement of Sale do not reflect the substance and reality of the transaction whereby Levitt's interest in petitioner and all claims against petitioner were resolved. Petitioner *573 gave the $ 50,000 check to Levitt, drafted by Levitt himself and ultimately countersigned by Schomaker, in payment for his stock. This was the price which he asked for his stock based on his knowledge of the company's assets and liabilities. This was the price he received. As a payment in redemption of his stock, the $ 50,000 is not deductible by petitioner. [12]
2. The Monthly Payments
We are left with the $ *574 12,000 payment called for by paragraph 2 of the Termination Agreement, of which $ 4,800 was paid in 1975. [13] At the trial respondent's counsel offered a "scenario" in which Schomaker, in order to obtain a deduction for petitioner's payment for Levitt's stock, offered to pay him $ 62,000 rather than the $ 50,000 asked by Levitt if he would agree to have the Termination Agreement describe the payment as compensation so that it would be deductible.While there is some basis for suspicion that this is what occurred, there is no evidence to support a finding to that effect. To the contrary, all the testimony is that, while the additional $ 12,000 may have been offered in part as a magnanimous gesture, it was intended to be payment for consultation services which Schomaker needed in assuming management of the brokerage business. After Levitt abruptly left Pittsburgh, Schomaker became responsible for petitioner's day-to-day operations but had no experience or background in handling such details. Levitt, moreover, had established oral arrangements with coal suppliers *575 which were important to servicing the West Penn contract. Schomaker testified that, when he met with Levitt during the evening prior to Levitt's departure, he asked the Federal authorities who were at Levitt's home whether he could arrange to have Levitt, on request, call him to advise on petitioner's business operations.He also asked whether Levitt, through proper channels, could receive and answer written inquiries. Both questions were answered affirmatively. On this basis, he agreed in writing to pay $ 12,000 for Levitt's consultation services. Between the time Levitt left Pittsburgh and the end of 1975, Schomaker talked by telephone with Levitt several times, met with him once in the marshall's office in Pittsburgh, and received five letters from him. One communication, for example, involved a disputed trucking bill, and Schomaker testified that the information obtained from that communication alone saved the company $ 2,000. Although Cindrich indicated that he thought that the $ 12,000 provision in the Termination Agreement may have been an act of magnanimity on Schomaker's part, he did recall that Schomaker expressed a "desire for future services or future consulting *576 on the part of Mr. Levitt." Cincrich expressly denied that there was any discussion with Schomaker to the effect that the additional $ 12,000 was offered in return for having the agreement designate the entire $ 62,000 payment as compensation. As we have previously noted, Cindrich simply did not negotiate the point. Levitt acknowledged that he had not sought the $ 12,000 compensation provision and confirmed that he consulted with Schomaker on petitioner's business by telephone and by letter. He explained that he spent a great deal of time in Pittsburgh (several days in 1975 and 6 months in 1976) in the custody of the United States Marshall (apparently to testify in pending litigation) and was permitted to talk with Schomaker by telephone. It these communications he gave Schomaker such assistance as he could. Basing our conclusion on the whole record, we conclude that the $ 4,800 which petitioner paid to Levitt in 1975 pursuant to paragraph 2 of the Termination Agreement was compensation deductible under section 162(a)(1).
To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. At the trial petitioner conceded an issue with respect to a claimed theft loss in the amount of $ 4,025. Petitioner has apparently abandoned a request for attorney fees made in the petition.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including-- (1) a reasonable allowance for salaries or other compensation for personal services actually rendered;↩
3. Levitt's tax liability is not in issue here.↩
4. Levitt testified that the West Penn "contract had a value because it could be sold" and that in his opinion "that contract could be taken to any coal broker in the country and sold on a percentage basis." By its terms the contract was not assignable, without West Penn's consent, but Levitt indicated that even though the contract "may say that" the nonassignsment provision would not prevent the sale of coal to West Penn through other brokers on a percentage basis. ↩
5. On petitioner's Pennsylvania Corporation Income Tax Return for 1975, the stated value of petitioner's common stock was reported to be $ 20,000. On its Federal income tax returns for the period covered by the West Penn contract, petitioner showed total net profits from the coal brokerage business exceeding $ 1,000,000. While the size of those net profits may not have been fully foreseeable, the prospects for profit were sufficient to induce Schomaker to virtually abandon his law practice and take over the management of the business; the amount of income in 1975 depends in large part upon the outcome of the instant case but, as we view the facts, was in the $ 70,000 to $ 100,000 range.↩
6. Sec. 1.162-7. Compensation for personal services. (b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows: (2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.↩
7. The preamble of the Termination Agreement is as follows: WHEREAS, Employee [Levitt] has been previously employed by Employer [petitioner] as President, General Manager and Sales Representation; and, WHEREAS, Employer [petitioner] has been engaged in the business of coal brokering; and WHEREAS, Employee [Levitt] has consummated various sales of coal on behalf of Employer [petitioner] which have resulted in earnings and profit to Employer [petitioner]; and WHEREAS, Employee [Levitt] is entitled to commissions on said sales as set forth herein and is terminating his employment with Employer [petitioner] as of the 3rd day of October, 1975;↩
8. Schomaker testified that he "analyzed the books as of the end of September, 1975" and "determined that there was approximately $ 70,000 that was left over after taking into account receivables, payables, paid payables and paid receivables." The reason for the difference between the two figures is not clear. Levitt explained that his $ 100,000 figure was not a precise one but, taking that approximate figure into account, $ 50,000 would be fair for his interest. ↩
9. At one point Levitt testified: Q. * * * Did you view it [the $ 50,000 he claimed] more as a division of profits rather than salary? A. Yes, because that's where I came up with the $ 50,000. Q. Did you make any further claim for salary other than what you made? A. I did not.↩
10. Levitt testified: Q. So having arrived at no further agreement for extra compensation, did you at this point feel that you were entitled to extra compensation? A. I felt that my position in the company was worth $ 50,000 to me. Q. And you had been compensated fairly up until that point? A. Right. In other words, there were profits in the company, and I felt I was getting $ 400 a week plus a car plus insurance, and Rick [Schomaker] was doing his bit with the law and getting paid for that, and at the end of the year we would take the profits that were left in the company and I would get my share and he would get his share. Q. If you had remained with the company and all these terrible events hadn't happened and you had to leave town, would you have negotiated for extra salary for the year 1975? A. No, not in 1975, I don't think so. Q. As far as you were concerned, you wanted $ 50,000 and that came out of profits, right? A. Yes, sir.↩
11. Levitt testified on cross-examination by petitioner's counsel: Q. By characterizing the transaction as a sale of stock, you expected them to reduce the tax consequences to you; is that right? A. No, sir. When I tell you I gave no consideration to stock, I had to liquidate, and that was the farthest thing, I mean as far as tax, that was the farthest thing from my mind. Q. The tax consequences. A. Absolutely. I did not care. See also fn. 12, infra.↩
12. Because of Levitt's need for immediate cash as a result of his departure from Pittsburgh, the countervailing tax considerations mentioned in the text, above, were frustrated as a means of assuring that the terms of Levitt's disposition of his interest in petitioner reflected the economic realities. As we have noted, Levitt simply "did not care" about the tax consequences of the transaction. Levitt testified that he had received a notice of deficiency for 1975 in which respondent had not challenged his reporting of the $ 50,000 as ordinary income. Even if the $ 50,000 has been erroneously treated as compensation in computing Levitt's tax liability, we do not think, in the circumstances here presented, that such treatment alters petitioner's liability.↩
13. Although the agreement called only for the payment of $ 800 per month, petitioner paid Levitt $ 1,600 per month.↩